2022 IL App (1st) 211542

THIRD DIVISION
February 18, 2022

No. 1-21-1542

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* R.J. | ) | |
|     a Minor, Respondent-Appellee, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Cook County |
| | ) | |
|     v. | ) | 2019 JA 803 |
| | ) | |
| Reginald J., | ) | Honorable |
|     Respondent-Appellee, | ) | Shannon P. O'Malley |
| | ) | Judge Presiding |
| (Benjamin C. and Heather S.-C., | ) | |
|     Intervenor-Appellants)). | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        R.J., the minor at the heart of this appeal, was born in July 2019. At birth, she had cocaine, methadone, and heroin in her system. She spent the first three weeks of her life in the hospital while doctors monitored her withdrawal. When she was healthy enough to leave, the Department of Children and Family Services (DCFS) took custody of her and entrusted her to Benjamin C. and Heather S.-C., who became her foster parents. Meanwhile, the State filed a petition to begin neglect proceedings.

¶ 2     In May 2021—nearly *two years* after her birth—the circuit court adjudicated the minor neglected and turned its attention to determine who would be responsible for her going forward. On October 28, 2021, and after multiple hearings where the parties—but not the foster parents, who were *not* parties—presented evidence, the court ordered L.J.M., the minor's paternal aunt, to be the minor's guardian and custodian, effective December 7, 2021.

¶ 3     The foster parents moved to intervene, arguing they had a right to intervention under the Juvenile Court Act of 1987 once the minor's placement with them was terminated and claiming, in the alternative, that the Act permitted intervention if the court, in its discretion, found it to be in the minor's best interests. See 705 ILCS 405/1-5(2)(c), (d) (West 2020). Both the minor's guardian *ad litem* (GAL) and the People of the State of Illinois (State) agreed that intervention was mandatory. The minor's father disagreed.

¶ 4     The court denied the motion to intervene, believing it had discretion in the matter. After the court denied reconsideration, the foster parents filed a notice of appeal and an emergency motion with this court to stay the dispositional order. We granted the stay and ordered expedited briefing.

¶ 5     We agree with the foster parents, the GAL, and the State that, under the Juvenile Court Act, foster parents who have had a minor in their home for over a year have an absolute statutory right to intervene when that placement has been terminated. We reverse the circuit court's order denying intervention and remand for further proceedings.

¶ 6                                    BACKGROUND

¶ 7     As the question before us is limited to the intervention of the foster parents and not the merits of the underlying dispositional order, we will discuss only the facts necessary for our disposition. In July 2019, M.F. gave birth to the minor. When she was born, the minor was drug-

exposed. Doctors found traces of cocaine, methadone, and heroin in her system. The minor spent three weeks in the hospital, healing from withdrawal symptoms.

¶ 8        While she healed in the hospital, DCFS took temporary custody of the minor. Seeking to place her with family if possible, DCFS investigators reached out to M.C., the minor's presumptive paternal grandmother. M.C. told investigators that she was not sure her son, R.J., was the minor's biological father. M.C. and one of her daughters later told investigators that they would be willing to care for the minor despite having doubts about her parentage. But either because M.C. was hesitant about taking the minor or because DCFS did not feel comfortable giving her to M.C., DCFS placed the minor in the custody of the foster parents.

¶ 9        In October 2019, DNA testing confirmed that R.J. was the minor's biological father. The parties, including various paternal relatives, attended a mediation session in March 2020 to determine if the minor could be placed with one of the paternal family members. That meeting produced a memorandum of agreement, where the agency responsible for handling the minor's case agreed to try to place the minor with one of her paternal relatives, including L.J.M., who was the minor's paternal aunt. The agency performed a background check on L.J.M., but it never completed a necessary safety inspection of her home. (We would merely note here that March 2020 also happened to mark the onset of the global COVID-19 pandemic.) In any event, the minor was not placed with any potential family members.

¶ 10       In August 2020, well into the COVID-19 pandemic, the agency again considered placing the minor with one of her paternal relatives at their request. The agency decided not to move the minor, however, because she was strongly attached to the foster parents, with whom she had lived at that point for more than a year.

¶ 11        On March 4, 2021, the minor' aunt, L.J.M., filed a motion to intervene and indicated that, if allowed to intervene, she would petition to be the minor's custodian and guardian. It is not clear to us whether the foster parents were ever aware of this motion; they were not included on the service list.

¶ 12        In May 2021, after numerous delays—just short of two years after the minor's birth— the court adjudicated the minor neglected for being born drug-exposed and residing in an injurious environment. Two months later, in July, the minor's father, R.J., filed a response in support of L.J.M.'s petition to intervene and requested that the court appoint her as custodian and guardian. Again, it is unclear whether the foster parents were aware of this filing; we are unable to locate the service list in the record.

¶ 13        At the first dispositional hearing in August, held virtually, the court denied L.J.M.'s motion to intervene and began to hear evidence for the dispositional hearing. Although the foster parents were still the minor's custodians, they were not parties to the case and were excused from the digital courtroom for significant parts of the August hearing. The hearing was continued to September, where the court heard more evidence about the minor's needs. Again, while the foster mother testified during the September hearing, the foster parents were not allowed to view or participate in significant parts of the proceedings, because the court excluded all witnesses. L.J.M. testified at the September hearing that she wanted the court to appoint her as the minor's custodian and guardian—but the foster parents tell us they did not hear this testimony, excluded as they were from the virtual testimony of other witnesses.

¶ 14        On October 28, 2021, the parties appeared in court on R.J.'s motion to appoint L.J.M. the minor's guardian and custodian and to finish the dispositional hearing. The foster parents were present, but since they were not parties, they were not represented by counsel. Both the

State and the GAL asked the court to appoint DCFS as the minor's guardian and allow her to remain with her foster parents. R.J. renewed his request that his child be placed with his sister, the minor's aunt, who would be made her guardian and custodian.

¶ 15      After argument, the court granted R.J.'s motion. The court found that the minor's parents were unfit, unable, and unwilling to parent her, but that L.J.M. satisfied all those criteria. The court believed that the minor could best develop her identity with her aunt. Although the court seemed to suggest it wanted the minor to go immediately with her aunt, the GAL requested that the court "not effectuate" its order until staff could develop a transitional plan so that the minor was not suddenly taken from her foster parents, with whom she had now lived for more than two years. The GAL also asked the court to allow DCFS staff to determine if L.J.M. needed any services to help care for the minor's special needs. The court agreed, making its order transferring guardianship and custody effective on December 7, 2021.

¶ 16      Six days after the October 28 order, on November 3, the foster parents moved to intervene in the proceedings. The court scheduled a hearing on the motion for December 1.

¶ 17      On November 29, the GAL filed a motion for reconsideration of the court's October 28 order transferring guardianship and custody to the minor's aunt. The GAL also sought to reopen the proofs, claiming it had evidence that the minor was reacting negatively, in various ways, to the visitations with the aunt.

¶ 18      The hearing on the foster parents' petition to intervene was held on December 1. The foster parents argued that section 1-5(2)(c) of the Act gave them an absolute right to intervene, since the minor had been in their home for more than one year and the court was terminating her placement with them. Alternatively, they argued that section 1-5(2)(d) gave the court discretion to allow their intervention if it was in the minor's best interest. Since the minor had been living

with them uninterrupted for nearly 2½ years, and they were acutely aware of her special needs, the foster parents argued that it was in her best interest to allow them to intervene.

¶ 19        The minor's father argued that the court had discretion under either clause of the statute and could only allow the foster parents to intervene if it was in the minor's best interest. And, he argued, since they had never sought to intervene before the dispositional hearing was completed, they should not be allowed to intervene after it was done.

¶ 20        The court, in a brief ruling, agreed with the minor's father that it had discretion and denied the motion to intervene. The foster parents immediately asked the court to reconsider its ruling, again arguing that section 1-5(2)(c) gave them an absolute right to intervene. The State also agreed that section 1-5(2)(c) did not give the court discretion to deny their motion and that they should be allowed to intervene. The court held firm that the foster parents' intervention was not in the minor's best interest and that it had discretion to deny the motion under either clause of the statute. The foster parents then asked the court to make a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason to delay the matter for appeal, but the court refused to make that finding.

¶ 21        On December 6, five days after their intervention was denied and one day before placement of the minor was to be transferred to L.J.M., the foster parents filed a notice of appeal and an emergency motion to stay the trial court's October order. We granted that motion and ordered expedited briefing.

¶ 22                                ANALYSIS

¶ 23                                    I

¶ 24        We specifically asked the parties to address our jurisdiction. Appellate jurisdiction can be a difficult question in the garden-variety civil action, where cases usually have an

identifiable end. It is thornier still in the family-law and child-protection settings, where cases may continue for many years, even decades, while impactful judgments are made by the trial court throughout. It is probably for this reason that the supreme court rules identify certain judgments in these cases that are immediately appealable. See, *e.g.*, Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016) (allowing for immediate appeal, without special finding, of judgments involving "custody or allocation of parental responsibilities *** or modification of such judgment"); Ill. S. Ct. R. 306(a)(5) (eff. Oct. 1, 2020) (allowing interlocutory review of orders "affecting the care and custody of or the allocation of parental responsibilities for unemancipated minors or the relocation *** of unemancipated minors); Ill. S. Ct. R. 307(a)(6) (eff. Nov. 1, 2017) (permitting immediate review of interlocutory orders "terminating parental rights or granting, denying or revoking temporary commitment in adoption proceedings").

¶ 25     The foster parents, joined by the GAL and the State, argue that another such specific provision is applicable here, namely Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016). Rule 304(b)(1) permits appeals, without a special finding, of "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." *Id.*

¶ 26     The father disagrees that this rule provides jurisdiction here. He claims that the matter at issue was not a proceeding covered by Rule 304(b)(1) and that, even if it were, the foster parents cannot utilize this rule because they are not "parties" to the proceedings below, and the judgment was not a "final" judgment.

¶ 27     We will address each objection in turn. There is only limited case law to guide us. We interpret Rule 304(b)(1) under the same principles as we would a statute. *McCarthy v. Taylor*, 2019 IL 123622, ¶ 17.

¶ 28                                        A

¶ 29        Again, Rule 304(b)(1) permits appeals, without a special finding, of "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016). The foster parents argue that the order denying intervention occurred in a "guardianship" proceeding.

¶ 30        The father, on the other hand, says that this was not the kind of "guardianship" proceeding envisioned under Rule 304(b)(1), that the matter here was "a custodial proceeding governed by the Juvenile Court Act" that is "not in the process of being administered (a process which by its nature is often of indeterminate length)." (Parenthetical in original.) The father's position is that Rule 304(b)(1) is limited to proceedings relating to probate and estates, particularly given the word "administration," a word common to estate law.

¶ 31        The father's argument is not without merit. No doubt, the reference to judgments or orders "entered in the administration of an estate, guardianship, or similar proceeding" brings to mind proceedings regarding estates. See generally 755 ILCS 5/1-1 *et seq.* (West 2020) (Probate Act of 1975). The references in the Probate Act of 1975 to "administration" of an estate or to an "administrator" are too numerous to count. See, *e.g.*, 755 ILCS 5/art. V (West 2020) ("Place of Probate of Will or of Administration"); 755 ILCS 5/art. IX (West 2020) ("Letters of Administration"). And the committee comments to Rule 304(b)(1) list examples of the types of orders that may be immediately appealed, which seem limited to estates: "Subparagraph (1) applies to orders that are final in character although entered in comprehensive proceedings that include other matters. Examples are an order admitting or refusing to admit a will to probate, appointing or removing an executor, or allowing or disallowing a claim." Ill. S. Ct. R. 304, Committee Comments (rev. Sept. 1988).

¶ 32    Nor can we fault the father's attempt to tie the loaded words "administration of" in Rule 304(b)(1) not only to the word "estate" that follows, but also to the rest of the clause— "guardianship, or similar proceeding." Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016). As he reads it, "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding" (*id.*) should be read grammatically as "a judgment or order entered in the administration of an estate, the administration of a guardianship, or the administration of a similar proceeding."

¶ 33    But for the following reasons, we do not think the father's reading of Rule 304(b)(1) is the proper one, nor do we limit guardianships as he would to instances relating to estates under the Probate Act.

¶ 34    For one, this court has twice held that a determination of a father's parentage during an abuse-and-neglect proceeding under the Act was immediately appealable under Rule 304(b)(1). See *In re Armani S.*, 2020 IL App (1st) 200616, ¶ 20 (paternity determination that finally determined status of party was appealable under Rule 304(b)(1)); *In re Devon M.*, 344 Ill. App. 3d 503, 508 (2003) (determination of paternity of alleged ward of court was appealable under Rule 304(b)(1), as it arose within "guardianship" proceedings).

¶ 35    *Armani S.*, 2020 IL App (1st) 200616, ¶ 20, merely cited *Devon M.* for support without additional discussion. The consolidated case of *Devon M.* involved abused or neglected children involved with pending adjudications of wardship under the Juvenile Court Act. In each case, an individual was alleged or suspected to be the father, but each individual refused to take a paternity test. *Devon M.*, 344 Ill. App. 3d at 505-07. Those children at that time were under the guardianship and custody of DCFS, and the GAL was, of course, appointed for each of the

children. *Id.* We considered these proceedings to be "guardianship proceedings" under Rule 304(b)(1) that rendered the judgments of parentage immediately appealable. *Id.* at 508.

¶ 36    Here, it is far clearer than in *Devon M.* that the dispositional hearing below would qualify as a guardianship proceeding. The question of the guardianship of this minor was front and center in the dispositional hearing. Indeed, in September 2021, in the middle of what was ultimately three separate court hearings over the child's disposition, the father moved the court to change the minor's guardianship and custody from DCFS and the foster parents, respectively, to his sister.

¶ 37    In any event, even on a blank slate, we would independently find that the hearing at issue here was a "guardianship" proceeding for purposes of Rule 304(b)(1). We understand that it might be natural to read the phrase "administration of" to modify not only the word that follows—"estate"—but also the rest of that clause: "guardianship, or similar proceeding." Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016). But we are unaware of any context (nor have we been cited any) in which the law refers to the "administration" of a guardianship. Administrators are appointed by the court to administer *estates*. See generally 755 ILCS 5/art. IX ("Letters of Administration"). Guardianships often arise in the context of an estate, of course, but the administrator does not "administer" them. Reading the phrase "administration of" to modify "guardianship" would lead to an illogical result. See *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27 (courts are not bound to construction of statute that leads to absurd result).

¶ 38    It would make even less sense for the phrase "administration of" to modify the final phrase "similar proceedings." That would mean the rule permits appeals from orders "entered in the administration of *** similar proceedings." Proceedings are not "administered."

¶ 39    We think, instead, the rule was intended to *explicitly* cover two types of

"proceedings"—those involving the administration of an estate, and those involving

guardianships—as well as other "similar proceedings." Of course, these proceedings may

overlap. Guardianships arise in a variety of contexts, often in estate proceedings. But not always.

Guardianships are created, among other things, to represent the interests of minors without

parents, abused or neglected minors, and adults who have been adjudicated disabled. See, *e.g.*,

755 ILCS 5/1-2.08 (West 2020); *id.* § 11-5(a); *id.* § 11a-3(a); 705 ILCS 405/2-17 (West 2020).

¶ 40    And it makes perfect sense that guardianship proceedings would be included in this

rule along with estate proceedings. Guardianships are similar to estates in the way that is most

relevant for purposes of Rule 304(b)(1): they can be extremely lengthy in nature, with

consequential and final orders being entered throughout that impact the rights of various parties,

without a discernible or predictable ending point.

¶ 41    We have noted that the purpose of allowing immediate appeals under Rule 304(b)(1)

in the estate context is twofold—so the party whose rights have been determined need not wait

years, even decades before securing an appeal, and because a reversal at that late date could

require the unwinding of other judgments and force a complicated and messy redistribution of

assets. See *Cushing v. Greyhound Lines, Inc.*, 2012 IL App (1st) 100768, ¶ 84. That concern is

present for guardianships as well.

¶ 42    The guardianship of an adult adjudicated disabled could last for decades, the

guardianship of a minor for the entirety of her childhood. If the right or status of a party were

finally determined early on in a proceeding involving a guardianship, it would be inefficient and

potentially unjust to wait until the guardianship terminated before allowing an appeal of that

judgment. It might not involve money, as in an estate's redistribution of assets, but it would involve something far more important—the well-being of the individual under guardianship.

¶ 43        So it seems perfectly rational and logical that our supreme court would have placed important decisions taking place within a "guardianship" proceeding under Rule 304(b)(1), just as it did for critical decisions regarding the administration of estates.

¶ 44        And if we view the word "guardianship" in Rule 304(b) as a standalone type of "proceeding" untethered from "administration of estates," as we believe we should, then we can think of no reason why we should place some unexpressed limitation on which types of "guardianships" were intended to be covered in this rule. Only guardianships arising from estates? Guardianships of adults but not minors? Vice versa? There is no indication of any such limitation. We will not read one in, particularly considering the inclusive modifier "or similar proceedings" at the end of the clause. That modifier does not suggest a narrow reading of the rule but an expansive one.

¶ 45        Finally, we would note that the General Assembly believed that Rule 304(b)(1) applied to proceedings under the Juvenile Court Act when it amended that act to provide that orders setting permanency goals for abused or neglected minors "shall be immediately appealable as a matter of right under Supreme Court Rule 304(b)(1)." 705 ILCS 405/2-28(3) (West 1998). Our supreme court invalidated that law as a violation of separation of powers, because orders setting permanency goals are not final judgments, and a legislative attempt to make a non-final judgment subject to appeal as of right was unconstitutional. *In re Curtis B.*, 203 Ill. 2d 53, 60 (2002).

¶ 46        Our supreme court in *Curtis B.* analyzed the finality or lack thereof of such permanency orders under the Juvenile Court Act, ultimately concluding they were not final

judgments and thus not amenable to appeal as of right. *Id.* at 59-60. But notably absent from that analysis was any indication that Rule 304(b)(1) would not apply to proceedings under the Juvenile Court Act at all, full stop, as the father argues here. Though we cannot glean precedential value from this non-discussion, we can at least say that, if the supreme court believed that proceedings involving abused or neglected minors had no place whatsoever in Rule 304(b)(1), as the father claims, the supreme court easily could have said so there.

¶ 47    For these reasons, we conclude that the dispositional hearing into which the foster parents attempted to intervene, which concerned whether the guardianship of this minor should transfer from DCFS to her aunt, was a "guardianship" proceeding under Rule 304(b)(1).

¶ 48                                B

¶ 49    That holding does not end our inquiry. Even if, as we hold, the order denying leave to intervene took place within a "guardianship" proceeding, Rule 304(b)(1) applies only to those judgments that "finally determine[ ] a right or status of a party." Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016). That, itself, prompts two questions: whether the order qualified as a "final" judgment, and whether the foster parents qualify as a "party" under the rule.

¶ 50    The first question is not difficult. The order denying leave to intervene was clearly a final judgment. The order finally determined the rights of the foster parents—they could not intervene in the proceeding here. See *In re Adoption of S.G.*, 401 Ill. App. 3d 775, 784 (2010) (order denying grandparents leave to intervene in adoption proceeding filed by foster parents was final judgment, as order "fixed and disposed of the [grandparents'] rights in the [foster parents'] action"); *In re Estate of Mueller*, 275 Ill. App. 3d 128, 139 (1995).

¶ 51    This is true outside the family law context, as well. In the typical civil arena, it has long been established that orders denying leave to intervene are final judgments. To the extent

the appellate courts have split, they have split *not* over whether such an order is "final" but over whether such an order is *appealable* as of right under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) or whether it is only appealable under Rule 304(a), after the trial court has included language in the order that there is no reason to delay an appeal from that judgment. See *Northern Trust Co. v. Halas*, 257 Ill. App. 3d 565, 573-74 (1993) (collecting cases).

¶ 52      But in all those cases, regardless of which side of that dispute on which they landed, there was never a dispute about whether a denial of a petition to intervene was a final judgment. There could not have been such a dispute, because both Rule 301 and Rule 304(a) apply only to appeals of a "final judgment." Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016); *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 23 (only final judgments are subject to appeal under Rule 304(a)). Indeed, even if the trial court includes the requisite Rule 304(a) language in an order, that order will not be subject to appeal under Rule 304(a) unless we determine that it was a final judgment. *Blumenthal*, 2016 IL 118781, ¶¶ 23-24; see *JL Properties Group B, LLC v. Pritzker*, 2021 IL App (3d) 200305, ¶ 49 ("A circuit court's inclusion of Rule 304(a) language in its order does not conclusively determine that the order is in fact appealable. [Citation.] Because Rule 304(a) applies only to final judgments, if the court's order is not in fact final, the inclusion of Rule 304(a) language is insufficient to confer appellate jurisdiction.").

¶ 53      The father attempts to isolate language in *Halas* and other cases suggesting that denials of a petition to intervene are not final judgments. But regardless of how it was phrased, the focus in those decisions was only on the *appealability* of a final judgment, which is the only things separating an appeal under Rule 301 (for final judgments that dispose of all claims as to all parties) from Rule 304(a) (for final judgments that dispose of fewer than all claims as to all

parties). The denial of a motion to intervene here was unquestionably an order that "finally determine[d]" the rights of the foster parents in this action under Rule 304(b)(1).

¶ 54    That still leaves the last issue. Even if the order here denying the foster parents' motion to intervene was a final judgment within a guardianship proceeding, there still remains the question of whether it fits within the ambit of Rule 304(b)(1)'s requirement that the order "finally determine[ ] a right or status of a *party*." (Emphasis added.) Ill. S. Ct. R. 304(b)(1) (eff. Mar. 8, 2016). The father notes that at no time were the foster parents "parties" to the proceeding below and, thus, he says, Rule 304(b)(1) is not applicable. But the case law suggests otherwise.

¶ 55    In *Estate of Mueller*, 275 Ill. App. 3d at 139, we held that an order denying the decedent's twin brother, J. Arnold, leave to intervene in the estate proceeding was an appealable order under Rule 304(b)(1). We reasoned that the order denying the motion to intervene "finally determine[d] J. Arnold's right to participate in the estate proceedings." *Id.* The would-be intervenor there, J. Arnold, was no different than the foster parents here. The father argues that *Mueller* involved an "an unusual set of facts" that were "not similar to that faced in this case." So it did, but none of those facts bore any relevance to the question of our jurisdiction, which rose and fell only on whether a denial of leave to intervene did or did not conclusively determine the right or status of the would-be intervenor.

¶ 56    While *Mueller* is the only on-point decision we have located, we would analogize to denials of petitions to intervene outside the family-law context. We have just noted that, in a more traditional civil action, denials of petitions to intervene may be appealed under Rule 304(a) if the court includes the requisite Rule 304(a) language in the order. See *Halas*, 257 Ill. App. 3d at 573-74 (collecting cases). But Rule 304(a), no different than Rule 304(b)(1), only applies to final judgments "as to one or more but fewer than all of the *parties* or claims." (Emphasis

15

added.) Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). The word "party" or "parties" appears five

different times in Rule 304(a) (see *id.*), but that has never stopped this court from finding

jurisdiction over appeals by would-intervenors who were *denied* party status. By the father's

reasoning, that entire line of case law regarding Rule 304(a) appeals was wrongly decided,

because Rule 304(a) only governs judgments against a "party." We do not find that case law

incorrect, and what is true for Rule 304(a) is likewise true for Rule 304(b)(1).

¶ 57    The inclusion of the word "party" in Rule 304(b)(1) does not foreclose an appeal of

an order denying leave to intervene, which by definition involves a person or entity denied party

status. This appeals thus falls under Rule 304(b)(1) in all respects. We have jurisdiction over this

appeal.

¶ 58                                        II

¶ 59    That brings us to the merits of this action, the narrow question of whether the foster

parents are allowed to intervene in these proceedings. They argue that the Juvenile Court Act

gives them two ways to do so. First, they say section 1-5(2)(c) grants foster parents an absolute

right to intervene if the child has been in their home for more than one year and the child's

placement there is being terminated. See 705 ILCS 405/1-5(2)(c) (West 2020). Second, the court

should have granted them permissive intervention under section 1-5(2)(d), as it was in the

minor's best interests to do so. See *id.* § 1-5(2)(d). Because we find the foster parents have a

right to intervene under section 1-5(2)(c), we need not address the latter argument.

¶ 60    Generally, intervention is a matter within the sound discretion of the trial court, and

we will not disturb that judgment absent a clear abuse of that discretion. *Halas*, 257 Ill. App. 3d

at 575. But whether the Juvenile Court Act grants the foster parents an absolute right to intervene

requires us to construe the language of section 1-5(2)(c), a question of law we review *de novo*. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6 (2009).

¶ 61     The rules of statutory interpretation are well established. Our primary task is to ascertain the intent of the legislature. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). If the language of the statute is clear and unambiguous, we need not rely on other tools to interpret the statute. *People v. Taylor*, 221 Ill. 2d 157, 162 (2006). We consider the statute in its entirety, keeping in mind the subject it addresses and the goals of the legislature in enacting it. *In re M.I.*, 2013 IL 113776, ¶ 15.

¶ 62     Section 1-5(2)(c) provides that, "[i]f a foster parent has had the minor who is the subject of the proceeding under Article II in his or her home for more than one year *** and if the minor's placement is being terminated from that foster parent's home, that foster parent shall have standing and intervenor status." 705 ILCS 405/1-5(2)(c) (West 2020). (There is an exception if the minor has been removed from the foster family's home due to an allegation of abuse or neglect or risk of danger (*id.*), but nobody argues that exception here.)

¶ 63     This language is clear and unambiguous. Foster parents "shall" have standing and the right to intervene in proceedings under the Act if two things are true: (1) the foster parents have had custody of the minor for more than one year, and (2) the minor's placement in their home is being terminated. *Id.* The first requirement is not in dispute; the foster parents have had custody of the minor here for more than a year—indeed, more than two years.

¶ 64     The father claims, however, that the minor's "placement" with the foster parents is not being "terminated." The court did not make a "placement" decision, in his view, but rather simply ordered the aunt to become the minor's custodian and guardian. Instead, the father

believes this statute only applies to situations where DCFS, in its role as guardian, is terminating a child's placement in a foster home.

¶ 65     That argument ignores both the language of the statute and the effect of the court's order. After the minor was discovered with drugs in her system at birth, DCFS "placed" the minor in the temporary custody of the foster parents under section 2-7(1) of the Juvenile Court Act. See *id.* § 2-7(1) (" 'Temporary custody' " means "the temporary *placement* of the minor out of the custody of his or her guardian or parent" and includes placement in foster home designated by DCFS (emphasis added)).

¶ 66     The court's October 28 order had the undoubted effect of changing that placement decision. The order transferred custody of the child from the foster parents to the aunt—a placement decision. See *id.* § 2-27(1)(a) (court may "*place* the minor in the custody of a suitable relative as legal custodian or guardian" (emphasis added)). The father cannot seriously dispute that "the minor's placement [was] being terminated from that foster parent's home." 705 ILCS 405/1-5(2)(c) (West 2020).

¶ 67     The father is correct that placement may be terminated by DCFS, as well, in its role as guardian of a minor. But the statute uses the passive voice—"the minor's placement is being terminated" (*id.*)—which strikes us as a deliberate attempt to *not* limit the various ways that a placement might be terminated or is who is responsible for that termination. To imply such a limitation would be inconsistent with the plain language of section 1-5(2)(c).

¶ 68     It would be inconsistent with the *intent* of that section, too. After all, it is not hard to imagine why this provision exists. Any minor who has lived with a foster family for more than a year is likely to have bonded with that family. And those foster parents are likely to be intimately familiar with the child's needs, challenges, progress, and the like. If the minor's placement with

18

those foster parents is terminated, the law is merely giving those parents the right to appear in court, with full party status, to take whatever action and argue whatever issues the foster parents deem necessary and vital to the minor's well-being. And it surely would make no difference whatsoever to the minor—with whom the law is principally concerned—whether it was a judge or an administrator who is responsible for that change of placement.

¶ 69      Nor do we agree with the trial court that section 1-5(2)(c) gives the court discretion in the matter. For one, contrast section 1-5(2)(c)'s use of the word "shall" with the other section of the Act under which the foster parents sought to intervene, section 1-5(2)(d). Subsection (2)(d) provides that "[t]he court *may* grant standing to any foster parent if the court finds that it is in the best interest of the child for the foster parent to have standing and intervenor status." (Emphasis added.) *Id.* § 1-5(2)(d). We cannot ascribe the use of the word "shall" in subsection (2)(c) and the word "may" in subsection 2(d) to an oversight. The legislature clearly intended to mean different things. See *People v. Ousley*, 235 Ill. 2d 299, 313-14 (2009) ("It is well established that, by employing certain language in one instance, and entirely different language in another, the legislature indicated that different results were intended.").

¶ 70      In this context, the term "shall" refers to an obligatory duty a governmental entity is required to perform, while "may" refers to a discretionary power the entity may exercise if it so chooses. *Id.* at 313. When the foster parents moved to intervene, only six days after the October 28 order began the process of terminating the minor's placement with them, the trial court was required to permit the foster parents' intervention under subsection 2(c). See *id.* (use-immunity statute providing that, upon motion of State, trial court "*shall order* that a witness be granted immunity from prosecution in a criminal case" was mandatory command on trial court (emphasis in original and internal quotation marks omitted)).

¶ 71       It may seem odd that the parents' right to intervene vested only after the trial court entered its dispositional order on October 28, after the judgment had already been made. We should make a few points here. First, while a dispositional order is certainly a monumental point in a minor's case, it is by no means the end of the matter. Having made the minor its ward, the court will review the child's progress at future permanency hearings. Those hearings may lead to more orders as the court tries to achieve a permanency goal for the ultimate disposition of the minor. Judgments previously rendered by a court, based on later developments and circumstances and evidence, could change. See generally 705 ILCS 405/2-22, 2-28 (West 2020). A good deal more remains to be decided for this child.

¶ 72       Second, it is not too late for the foster parents to challenge *this* dispositional order, which they appear inclined to do. For one thing, a postjudgment motion for reconsideration is pending, filed by the GAL, on which the trial court was set to rule before we issued our stay. So that dispositional order is not yet a final and appealable judgment. The foster parents may seek to introduce additional evidence, they may choose to file their own postjudgment motion, or, at a minimum, they will now have the right as a party to appeal the dispositional order if necessary.

¶ 73       And third, the facts, more than the statute, are to blame for the timing. Adjudicatory hearings should be held within 90 days after a petition for wardship is served. *Id.* § 2-14(b). If the court finds a minor abused, neglected, or dependent, the court shall hold a dispositional hearing within 30 days of that finding. *Id.* § 2-21(2). The General Assembly created a system that should take no more than 120 days to determine if a child was abused, neglected, or dependent, then find a place and create a plan for that child.

¶ 74       That obviously did not happen here. The minor was not adjudicated neglected until May 2021, nearly two years after her birth. The dispositional order was not entered until October

28, 2021. We recognize that a question over paternity as well as the COVID-19 pandemic played roles in the delay. There are other allegations of the reasons for delay that need not concern us for purposes of this appeal. The bottom line here is that the minor's "temporary custody" with the foster parents has lasted well over two years. The system has thus far not worked as well as it might have for the person around whom the entire system is centered—the minor.

¶ 75        In any event, the foster parents had a statutory right to intervene in the proceedings under section 1-5(2)(c) of the Juvenile Court Act. The judgment of the circuit court is reversed.

¶ 76                                    CONCLUSION

¶ 77        The judgment of the circuit court is reversed. The cause is remanded with instructions to grant the foster parents leave to intervene. The mandate in this cause shall issue immediately. The stay entered previously by this Court is lifted.

¶ 78        Reversed and remanded with instructions.

¶ 79        Mandate to issue immediately; stay lifted.

---

**No. 1-21-1542**

---

| | |
|---|---|
| **Cite as:** | *In re R.J.*, 2022 IL App (1st) 211542 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-JA-803; the Hon. Shannon P. O'Malley, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Monique Woody and John Whitcomb, of Monahan Law Group, LLC, of Chicago, for intervenors-appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Victoria Kennedy, Assistant State's Attorneys, of counsel), for the People. |
| | Sharone R. Mitchell Jr., Public Defender, of Chicago (Kathryn Pelech, Assistant Public Defender, of counsel), for other appellee. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Carrie Che-Man Fung, of counsel), for minor-appellee. |

---