2023 IL App (4th) 220930

NOS. 4-22-0930, 4-22-0931, 4-22-1053, 4-22-1054 cons.

FILED
June 16, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* Cal. E. a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Carroll County |
|           Petitioner-Appellee, | ) | |
|       v. | ) | |
| Demerle S. and Anthony E., | ) | |
|           Respondents | ) | |
| | ) | |
| (Traditional Council of Togiak, Intervenor-Appellee; | ) | |
| Connie W. and David W., Intervenors-Appellants)). | ) | |
| _____ | ) Nos. | 20JA3, |
| | ) | 20JA4 |
| *In re* Cas. E. a Minor, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|           Petitioner-Appellee, | ) | |
|       v. | ) | |
| Demerle S. and Anthony E., | ) | |
|           Respondents | ) | |
| | ) | Honorable |
| (Traditional Council of Togiak, Intervenor-Appellee; | ) | David M. Olson, |
| Connie W. and David W., Intervenors-Appellants)). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Harris and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1      In April 2020, the State filed petitions for adjudication of wardship alleging that

Cal. E. (a male born December 2012) and Cas. E. (a female born November 2014), the children of

Demerle S. and Anthony E., were neglected. Demerle was a member of the Native Village of

Kwinhagak and had aunts and uncles who were members of the Traditional Council of Togiak

(Tribe) (both groups being federally recognized Indian tribes located in Alaska); Anthony had no known Native American ancestry.

¶ 2    In July 2020, at the adjudicatory hearing, Demerle and Anthony executed written objections to the Tribe taking jurisdiction of the case under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 *et seq.* (2018)). Also in July 2020, the trial court adjudicated the minors neglected and made them wards of the court.

¶ 3    In September 2020, Anthony died, and in November 2020, Demerle died. In December 2020, the State sent notice of the neglect proceedings to the Tribe, which was the Tribe's first notice. The Tribe began participating in the neglect proceedings in February 2021 and filed a written motion to intervene in March 2021. In November 2021, the Tribe filed a motion to transfer jurisdiction to the Togiak Tribal Court pursuant to section 1911(b) of ICWA (*id.* § 1911(b)).

¶ 4    In September 2022, following a June 2022 evidentiary hearing, the trial court granted the Tribe's motion to transfer jurisdiction. In October 2022, the foster parents of Cal. E. and Cas. E., Connie W. and David W., filed a motion to intervene and motions to stay and reconsider the transfer order. In November 2022, the court entered an order denying the foster parents' motions, concluding that they did not have standing to intervene. In that same order, the court granted the request of the State and guardian *ad litem* (GAL) to stay the transfer order pending appeal.

¶ 5    The foster parents appeal, arguing that the trial court erred by (1) finding that the foster parents were not parties, (2) failing to admonish them of their right as parties to participate in the transfer hearing, and (3) failing to apply the existing Indian family exception to ICWA.

¶ 6    The State, although technically an appellee, agrees generally with the foster parents and argues that (1) the trial court erred when it found that the foster parents were not parties and

(2) the court should have denied the motion to transfer jurisdiction because (a) the minors were not "Indian children" subject to ICWA, (b) the minors' biological parents formally objected to tribal jurisdiction, and (c) good cause existed to deny the transfer.

¶ 7 The Tribe responds that (1) Illinois courts no longer have jurisdiction over these matters, (2) the trial court correctly found that the foster parents were not parties, (3) the foster parents do not have standing to appeal the transfer order, and (4) the court correctly found that good cause to deny the transfer did not exist.

¶ 8 We conclude that the trial court erred when it found that (1) the foster parents lacked standing to intervene, (2) the parents' written objections to transfer were (a) rendered a nullity by their deaths and (b) filed prematurely, and (3) good cause to deny the transfer did not exist. Accordingly, we reverse and remand for further proceedings.

¶ 9 I. BACKGROUND

¶ 10 A. The Petitions, Adjudicatory Hearing, Parental Objections to Transfer, and

Dispositional Hearing

¶ 11 In April 2020, the State filed petitions for adjudication of wardship alleging that Cal. E. and Cas. E., the children of Demerle S. and Anthony E., were neglected because their environment was injurious to their welfare due to exposure to substance abuse. 705 ILCS 405/2-3(1)(b) (West 2020). That same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 12 In July 2020, the trial court conducted an adjudicatory hearing. At that hearing, Demerle and Anthony executed and filed in open court a written "Parents' Objection to Indian Tribe Jurisdiction." The objection stated that "[Anthony], the natural father, and [Demerle], the

natural mother of [Cal. E.], the minor child, hereby objects to the Traditional Council of Togiak (Indian Tribe) taking jurisdiction over the above named minor pursuant to [ICWA]." At the same time, the parents executed an identical document relating to Cas. E. (We note that the transcript of the hearing at which the execution occurred is not included with the report of proceedings. We further note that although the parents were not represented by counsel, in April 2020, the court advised both Anthony and Demerle in writing of their right to have counsel appointed for them. A May 2020 docket entry states "parents to each retain att[orney]," but both parents thereafter represented themselves.) The court then heard testimony in support of the petition for adjudication of neglect. At the conclusion of the hearing, the court adjudicated Cal. E. and Cas. E. neglected minors.

¶ 13       In August 2020, the trial court conducted a dispositional hearing. A report prepared for the court by Lutheran Social Services of Illinois (LSSI) stated that the children were "currently placed with Fictive Kin Connie [W.]" and the permanency goal was return home within 12 months. (We note that the record does not state with specificity the date that the minors were first placed with Connie W. and David W., but no party disputes the foster parents' claim in their October 2022 filings that the children had been placed with them for 29 months.)

¶ 14       At the conclusion of the dispositional hearing, the trial court entered a written order finding that it was in the best interests of Cas. E., Cal. E., and the public that the minors be made wards of the court. The court further found Demerle and Anthony unfit or unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors. The court placed custody and guardianship of the minors with the guardianship administrator of DCFS and set the case for a permanency hearing in February 2021.

¶ 15                              B. Notice to the Tribe Under ICWA

- 4 -

¶ 16          On December 29, 2020, the state's attorney's office filed with the trial court a written "Notice of Rights Under [ICWA]." The notice was sent to Emma Wassillie, a "Tribal Children's Worker" of the Tribe, located in Togiak, Alaska.

¶ 17          The notice advised that (1) a petition had been filed in Carroll County circuit court involving Cas. E. and Cal. E., (2) ICWA may apply because the minors may be members of or eligible for membership in the Tribe, (3) the minors' mother died in November 2020, (4) the minors' father died in September 2020, and (5) the Tribe had the right to intervene in the proceedings and petition the court to transfer jurisdiction to tribal court. (We note that in May 2020, the State mailed a notice of hearing for a June 2020 status hearing to "ICWA Representative, Tribal Children's Service Worker, P.O. Box 310, Togiak, AK 99678," but this mailing did not comply with the formal notice requirements of section 1912 of ICWA (25 U.S.C. § 1912 (2018)). The parties do not dispute that proper notice under ICWA was not served upon the Tribe until December 2020.)

¶ 18          C. The Tribe's Motions To Intervene and Transfer Jurisdiction Under ICWA

¶ 19          In March 2021, the Tribe, without the assistance of counsel, filed a form document requesting to intervene pursuant to section 1911(c) of ICWA (*id.* § 1911(c)).

¶ 20          In April 2021, the Tribe filed "Tribal Enrollment Verification" documents executed March 23, 2021, enrolling Cas. E. and Cal. E. as members of the Traditional Village of Togiak.

¶ 21          In September 2021, the Tribe filed a "Verification of Enrollment," stating that Demerle was enrolled as a member of the Native Village of Kwinhagak as of December 14, 2016.

¶ 22          In October 2021, the Tribe, through local counsel, filed a written motion to intervene, arguing that (1) Cas. E. and Cal. E. were "Indian children" and (2) the Tribe qualified as the minors' tribe under ICWA because the minors were either "member[s] of the Tribe, eligible

for membership in the Tribe, or eligible for membership in more than one tribe and ha[d] more significant contacts with [the Togiak] Tribe."

¶ 23        In November 2021, the Tribe filed a "Motion to Transfer Jurisdiction and Dismiss the Case" pursuant to section 1911(b) of ICWA (*id.* § 1911(b)), seeking transfer of jurisdiction from the Carroll County circuit court to the Tribal Court of the Traditional Council of Togiak. The Tribe asserted that (1) the minors were "Indian child[ren]" as defined in section 1903(4) of ICWA (*id.* § 1903(4)), (2) the Tribe qualified as the "Indian child[ren]'s tribe" as defined in section 1903(5) of ICWA (*id.* § 1903(5)) because the minors were members of the Tribe, (3) the parents of the children were deceased, and (4) good cause did not exist to deny transfer of the proceedings to tribal court.

¶ 24        In January 2022, the trial court granted the Tribe's motion to intervene.

¶ 25                    1. *The Tribe's Motion for Recusal*

¶ 26        In March 2022, the parties convened for hearing on the Tribe's motion to transfer jurisdiction. The Tribe made an oral motion asking the current trial judge, who had presided over the minors' cases since it was filed, to recuse himself because he had represented Anthony in a previous case. The judge agreed to recuse himself, and the matter was reassigned to a new judge.

¶ 27                2. *The Hearing on the Motion To Transfer Jurisdiction*

¶ 28        On June 16, 2022, the trial court conducted a hearing on the Tribe's motion to transfer jurisdiction. The hearing was conducted in open court, but some individuals also attended remotely via Zoom. The foster parents of Cal. E. and Cas. E. were present at the hearing but were not represented by counsel and did not participate.

¶ 29        At the beginning of the hearing, the trial court asked which parties were objecting to the transfer and noted that the biological parents had "objected or vetoed the transfer" in a

written filing in July 2020. The State and GAL then announced that they, too, objected to the transfer.

¶ 30    The trial court, after consulting with the parties and without objection, then took judicial notice of the entire contents of the court file and admitted the Tribe's 12 exhibits into evidence. (The exhibits consisted of the following: (1-2) tribal enrollment verifications for the minors, (3-6) photographs of unidentified people, (7) notice of rights, (8) certificate of service, (9) motion to intervene, (10) notice of intervention, (11) affidavit of tribal membership for Demerle, and (12) "Dee Dee S[.]" Facebook message.)

¶ 31    The following witnesses then testified.

¶ 32                    a. Tricia Patterson

¶ 33    The State called Tricia Patterson to testify. (We note that the Tribe also called Patterson in its case-in-chief. We include all of her testimony below.) Patterson stated that she was the GAL for Cas. E. and Cal. E. (We note that in September 2021, the trial court entered an order appointing Patterson as GAL for the minors and appointing David Weismiller as attorney for the GAL. Patterson was affiliated with Court Appointed Special Advocates for Children for Lee, Carroll, and Ogle Counties in Illinois.) Patterson testified that she visited with the minors once a month. Patterson testified that, although she had never spoken with the minors about their Indian heritage, she knew that the foster parents had done so. Patterson did not know the content of the conversations between the foster parents and the minors on that topic. In response to questions by Weismiller, Patterson testified that she had talked to the minors about 12 times and at no time did the minors bring up the topic of their Indian heritage or their relatives on their mother's side.

¶ 34    The Tribe questioned Patterson about her position on transfer. Patterson stated

that she objected.

¶ 35                                    b. Amy McChesney

¶ 36           The State called Amy McChesney to testify. McChesney stated that she was a child welfare specialist and had been assigned to the minors' case for "at least a year." (We note that, according to court reports, McChesney was employed by LSSI.) She testified that the children were placed in a "licensed fictive kin" placement and she met with the minors once a month. At her most recent visit with the children, she discussed with the minors their Indian heritage. She said she "wanted to start to see where their knowledge was so [she] asked basic questions." McChesney stated that "the youngest [(Cas. E.)] *** [said] that Indians live in teepees and they wear their hat with feathers and they have gowns" and that she had read stories in school. McChesney further stated that "[t]he older one [(Cal. E.)]" expressed a more negative view of Indians, that "Indians [were] aggressive and violent and they have guns." McChesney stated that the children did not express any understanding that they possessed Native American heritage. She spoke to them about their heritage, being part of a tribe, and having family in Alaska. McChesney testified that she had not informed herself where Togiak, Alaska, was located prior to the hearing.

¶ 37           On cross-examination by the Tribe, McChesney stated that "[a]fter asking the children *** if they would like to speak to their great aunt, they both said they would like that" and that "[t]hey do want to know about their heritage." McChesney testified that the conversation "sparked more questions about biological mom. C[al].[ ]E. had mentioned that he did not have pictures of mom, [but] had pictures of dad," and that the children were "asking a lot of questions now about the family and extended family." McChesney testified that because the children have expressed a desire to know about their heritage, "moving forward with the transfer

would be appropriate at this time."

¶ 38    On cross-examination by the GAL, McChesney testified that she had been the caseworker for over a year and had written many reports for the court. She could not recall if, in any reports prior to the most recent, she had raised the issue of the children asking about their heritage. McChesney also testified that she had not had any training regarding how to discuss family heritage with children. She also stated that she had not done any research about the Tribe and had no personal knowledge about the Tribe. McChesney testified that in May 2022, the foster parents told her that they had spoken to the children about their Native American heritage.

¶ 39                          c. Emma Wassillie

¶ 40    The State called Emma Wassillie to testify. (We note that the Tribe also called Wassillie to testify in its case-in-chief. We include all of Wassillie's testimony below.) Wassillie testified remotely from Alaska. She stated that she was Demerle's maternal aunt and the children's great-aunt. She lived in Togiak, Alaska, and was part of the Tribe. Wassillie stated that (1) Togiak was located in the Bristol Bay area of Alaska, (2) it takes about two days to get there from Illinois, and (3) one has to fly into Togiak because there are no roads. (We note that, according to United States Census Bureau data, the population of Togiak, Alaska, in 2020 was 817. *City and Town Population Totals: 2020-2022*, U.S. Census Bureau (May 15, 2023) https://www.census.gov/data/datasets/time-series/demo/popest/2020s-total-cities-and-towns.html [https://perma.cc/PGK3-TKTF]).

¶ 41    Wassillie testified that neither Cas. E. nor Cal. E. had ever been to Togiak. The State then asked about Wassillie's contacts with the children. The Tribe objected, arguing that the children's contacts with the Tribe were not relevant to whether good cause existed to deny the transfer. The court overruled the objection, stating that the Tribe may be correct, but if the

court determined that the existing Indian family exception applied, the minors' contacts with the Tribe could be relevant.

¶ 42    The State then asked Wassillie the following questions:

"Q. [H]ave you had any conversations with [Cas. E. or Cal. E.]?

A. No.

***

Q. Do you know if [Cas. E. or Cal. E.] have had any other contact with members of [the] tribe, other than Demerle, their mother?

A. Yeah.

Q. And who is that?

A. My brothers and sisters.

Q. Okay. Did they travel down to Illinois to visit them?

A. No.

Q. Was it just a telephone conversation?

A. Telephone, probably Face Timing, Facebook.

Q. Sure, okay. That's all the questions I have."

¶ 43    The GAL then questioned Wassillie further about her contacts with the minors, over the Tribe's continuing objection. Wassillie testified that she had never seen the children. To her knowledge, other members of the Tribe had seen the children only "over the phone and pictures and Facebook."

¶ 44    The Tribe questioned Wassillie about her conversations with Demerle. Wassillie identified a printout of a Facebook message, testifying that she received the message from Demerle on November 18, 2020. Wassillie stated that Demerle "was sending me a message, reaching out

to me, asking for help." (We note that the Facebook message was admitted as an exhibit and stated, "Hi I need to speak with u, please call me whenever u have some free time it's regarding my children. Thanks.") Wassillie stated that she followed up with Demerle by phone. According to Wassillie, "[Demerle] was stating that she needed help, that the foster parents [were] trying to adopt the children and she wanted me to help her, that she didn't want her kids adopted out to— she didn't want the kids adopted to that [*sic*] foster parents."

¶ 45        Wassillie testified that Demerle wanted the family to know what was going on, so Wassillie met with her brothers and sisters—Demerle's aunts and uncles—but that same month, Demerle died. Wassillie stated that she "told [Demerle] to send the notices that she ha[d] because I didn't receive any notices nor my tribe didn't receive any notices." According to Wassillie, Demerle wanted the Tribe to get involved.

¶ 46        Wassillie testified that after learning that Demerle had died, she made calls to the courthouse. (We note that the record does not state which courthouse Wassillie called or the result of those calls.) Wassillie stated that she currently worked as an "ICWA Case Worker 2" with the Tribe and had been working in that position since 2008. She stated that, when she gets "notices from any cases," she meets with the tribal judges, who then decide whether to intervene. Wassillie would also notify the families and try to find families for placement. Wassillie had been involved in 12 to 15 cases that had been transferred to tribal court.

¶ 47        On cross-examination by the State, the prosecutor asked how the tribal court makes a "best interest determination of what should happen to the child?" Wassillie answered as follows:

> "They have a Tribal Court Clerk, and once the case is transferred, they're supposed to be working with the family, like with—have a safety plan. They will do the walkthrough, come look at the home and work with the family, and they are

supposed to review the case for so many months and—you know, until its closed."

¶ 48        Wassillie also testified that out of the 12 to 15 cases that had been transferred to tribal court while she was a tribal caseworker, only two or three were transferred from out of state. (The record does not reflect from which other states those two or three cases were transferred.) The State asked, "And would the Tribal Court, then travel to that state to determine what the best interests are of that child?" Wassillie answered, "No, we've done it over the phone." She recalled one case where a caseworker brought the child to Anchorage and Wassillie picked up the child at the airport. Wassillie stated, "That was the only time—no, I didn't have to travel. We just did everything over the phone."

¶ 49                              d. Ryann Unabia

¶ 50        Counsel for DCFS called Ryann Unabia to testify. Unabia stated that she was an ICWA specialist for DCFS. Unabia stated that she had never met with the children and had not reviewed the entire case file but had communicated with McChesney about the case.

¶ 51        Unabia testified that it was "extremely concerning" to her that the children had been with the foster family for "several years, and during that time, it was not mentioned that they were specifically Alaskan Native[,] even more specifically towards the Togiak community." Unabia was concerned that "the children had not had the opportunity to know about their culture" and "how that would affect their self-esteem and self-image as they grow up." When asked her position on transfer, Unabia answered that it would be best for the Tribe to decide, but added that her personal experience of growing up on a reservation had a positive impact on her development.

¶ 52        On cross-examination by the GAL, Unabia testified that she had never talked to the children and did not have any personal knowledge about what information the children had regarding their Native American ancestry. She stated that, based upon what she has been told by

McChesney, the minors were "learning a historical point of view from the eastern side of the country rather than an actual current *** knowledge of the community in Alaska."

¶ 53 At the conclusion of the evidence, the trial court asked the parties to submit written closing arguments, addressing (1) the validity of the biological parents' written objections and (2) the existing Indian family exception.

¶ 54 3. *The Closing Arguments*

¶ 55 In July and August 2022, the parties filed written closing arguments.

¶ 56 a. The Tribe's Closing Argument

¶ 57 The Tribe asked the trial court to transfer jurisdiction to the Togiak Tribal Court, arguing that "good cause not to transfer does not exist." Specifically, the Tribe argued that (1) the parental objection was filed prior to notification to the Tribe and was later rescinded by Demerle, (2) the delay in hearing the Tribe's motions was "almost entirely the result of the State and GAL's actions" as opposed to the Tribe's and the parents' actions, (3) any lack of contacts between the children and the Tribe did not constitute good cause because the existing Indian family exception is not good law, and (4) "the issue of transfer of jurisdiction [should not] be a matter of best interest of the children." (We note the existing Indian family doctrine is a judicially created doctrine under which, when the minors have no social, cultural, or political connection to an Indian tribe, ICWA does not apply because the stated policy of ICWA is to prevent the removal of Indian children from Indian families. See *In re Adoption of S.S.*, 167 Ill. 2d 250, 265-70, 657 N.E.2d 935, 942-45 (1995) (Heiple, J., concurring, joined by Bilandic, C.J., and Miller, J.).)

¶ 58 Counsel for DCFS filed a written closing argument that reiterated the points argued by the Tribe. On appeal, DCFS has adopted the Tribe's brief.

¶ 59 b. The GAL's Closing Argument

¶ 60       The GAL objected to the transfer of jurisdiction. Regarding the parental objections, the GAL argued that (1) both parents objected to tribal jurisdiction, (2) the trial court heard no evidence that Demerle rescinded her objection, (3) Anthony never rescinded his objection, and (4) "there has been no evidence or testimony that the death of the father supersedes his prior written objection." The GAL also argued that, because the children in this case "have no connection to the tribe other than the fact that their mother was Native American," the existing Indian family doctrine should be applied.

¶ 61                          c. The State's Closing Argument

¶ 62       The State also objected to transferring jurisdiction to the tribal court. First, the State argued that both parents objected to the transfer and there was no evidence that either parent rescinded their objection. Second, the State argued that good cause existed to deny the transfer. Specifically, the State asserted that (1) the objection of the GAL should be considered as a factor against transfer and (2) transfer to Togiak, Alaska, would present an undue hardship on the parties and witnesses in this case. Third, the State argued that the existing Indian family exception should apply because the children (1) had never been to Alaska, (2) had no knowledge of their Indian ancestry, and (3) did not become members of the Tribe until after the proceedings had been initiated and their becoming members happened without their request or input.

¶ 63                          4. *The Trial Court's Ruling*

¶ 64       In August 2022, the trial court filed a written "Memorandum Opinion and Order," granting the Tribe's motion to transfer jurisdiction. However, the court made clear that it was not "entering" the order at that time; instead, the court would formally enter a final judgment on September 15, 2022, thereby giving the parties time to react and respond to the court's decision.

¶ 65       The memorandum first recited "background information," noting that the children

had been the subjects of a 2016 neglect proceeding. The trial court wrote, "Although this Court has not confirmed, it is abundantly clear that the 2016 cases ended with the restoration of custody with the biological parents—because these 2020 cases would assuredly not exist otherwise." The court noted that the Tribe sought to intervene in the 2016 cases, but the court did not state (1) whether the Tribe successfully intervened, (2) what relief it sought, if any, or (3) whether any relief sought was granted or denied. The court did note that included in the 2016 case file was an affidavit generated by the Tribe stating that the children were eligible for membership. (We note that an August 2020 court report states that the 2016 cases were closed in 2018 with the children being returned to Anthony. Although the children were returned to Anthony, Demerle's parental rights were not terminated. The 2020 cases are clearly new proceedings, independent from the 2016 proceedings.)

¶ 66        The trial court then recited the procedural history of this case, which was consistent with our earlier description. Regarding the parental objections to tribal jurisdiction, the trial court noted that (1) both parents executed a written objection to the Tribe taking jurisdiction of the children pursuant to ICWA, (2) Demerle was "of Indian descent and *** a member of an Indian Tribe, but she [was] not a member of Togiak," and (3) both children were enrolled in the Tribe after the neglect proceedings began.

¶ 67        The trial court also wrote that "the first known formal Notice sent to the Tribe was sent by the Carroll County State's Attorney's Office and directed to the Tribe on December 29, 2020," after both parents had died. The Tribe "actively participated" in permanency hearings in February and March 2021. The court wrote that that Tribe "filed to formally intervene and was granted intervenor status" at the March 2021 hearing.

¶ 68        The trial court then (1) found that the children qualified as "Indian children" under

ICWA, (2) declined to apply the "existing Indian family exception," and (3) addressed (a) the parental objections and (b) whether there was good cause to deny transfer.

¶ 69                                    a. The Parental Objections to Transfer

¶ 70        The trial court first addressed the Tribe's argument that the parents' written objections to transfer were void because they were executed prior to the Tribe receiving notice of the neglect proceedings pursuant to section 1912 of ICWA (25 U.S.C. § 1912 (2018)). (We note that the parental objections were made pursuant to section 1911 of ICWA, which provides that a state court shall transfer a foster care proceeding to the jurisdiction of a requesting tribe, absent objection by either parent. *Id.* § 1911(b). We discuss this section in more detail *infra* ¶¶ 130, 141-53.) The court examined the language of section 1914 of ICWA, upon which the Tribe relied, which provides that "[a]ny Indian child who is the subject of any action for foster care placement or termination of parental rights *** [or] the Indian child's tribe may petition *** to invalidate such action upon a showing that such action violated [among other things, the notice requirements of section 1912] of [ICWA]." 25 U.S.C. § 1914 (2018). The court stated it was not readily apparent what Congress meant by "such action," but it was clear that "such action" "[did] not apply to a parent filing their own declaration of their desire to resist exercise of tribal jurisdiction." The court continued, "A parent's 'Objection' to a transfer to tribal jurisdiction is not an 'action' that a Court can declare void under this section, any more than it could declare an Answer or other responsive pleading (like a Motion to Dismiss) filed by either parent to be 'void.' "

¶ 71        Regarding Demerle's alleged oral recission of her written objection to transfer, the trial court noted that "[t]his evidence was scant and completely non-definitive—it was a hearsay statement made to a party with an interest in the outcome of this case *** and in no way would the Court think that this evidence would support a finding that the Mother actually revoked her written,

signed, and court-filed Objection to tribal jurisdiction." The court noted that even if Demerle rescinded her objection, it would be irrelevant because Anthony never revoked his objection, and under section 1911(b) of ICWA (*id.* § 1911(b)), "either parent can object to the assertion of tribal jurisdiction, and either parent holds the 'trump card,' and ICWA does not require both parents to do so, and if the Father's Objection stands, it is a nullity that Mother's Objection was revoked."

¶ 72        However, the trial court went on to discuss the effect of the parents' deaths on their objections. The court mused that if the mother wanted tribal jurisdiction and the father did not, then the father died, "[i]n what realm would it make sense that Dad's objection still holds unassailable sway after his death? That scenario appears markedly unfair to everyone else (and to everyone who is alive)." On this basis, the court found that "it would make more sense to treat a deceased parent's objection to a transfer to tribal jurisdiction as a nullity under ICWA."

¶ 73        The trial court also found that the language of section 1911 of ICWA required that a petition for transfer be on file before a parent "can register an effective objection to the transfer." Again, the court cited no authority for this proposition, but stated that it "certainly made sense" that a parent could not object to a transfer before a party requested a transfer. On this basis, the court found that the parents' July 2020 objection to tribal jurisdiction was premature and "the parents would need to definitely reiterate their preemptive objection after the Petition to transfer [was] filed, an option unavailable here because both parents died before that Petition was filed." The court wrote, "All told, the Court believes that the Objections signed by the parents are a nullity."

¶ 74              b. Good Cause To Deny Transfer of Jurisdiction

¶ 75        The trial court found that the GAL and State failed to demonstrate good cause to deny transfer. The court focused primarily on what it could *not* consider pursuant to regulations

issued by the Bureau of Indian Affairs (BIA). Namely, the court noted it could not consider (1) whether the transfer could impact placement of the children, (2) the nature and extent of the minors' connection with the tribe seeking transfer, and (3) the best interests of the children. The court mused at some length about the prohibited factors and then considered the "distance between Northwest Illinois, where these children have spent their lives, and Alaska, where the Togiak Tribe is located." The court determined that the ability to hold proceedings remotely via Zoom meant that "[t]he participation in Alaska of the interested persons living here in Illinois is no more burdensome than the participation of interested persons living in Alaska participating in Court proceedings in Illinois."

¶ 76            On September 15, 2022, the trial court entered its written "Final Judgment," granting the motion to transfer jurisdiction "for the reason stated in the August 12, 2022, Memorandum Opinion and Order."

¶ 77            D. The Foster Parents' Notice of Party Status and Motion To Stay Transfer

¶ 78            On October 13, 2022, Connie W. and David W., the foster parents of Cal. E. and Cas. E., through counsel, filed a "Notice of Party Status," providing notice they were intervening as a matter of right pursuant to section 1-5(2)(c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-5(2)(c) (West 2020)). Specifically, the foster parents alleged that Cal. E. and Cas. E. had been in their care for 29 months and placement of the minors was being terminated from their home.

¶ 79            At the same time, the foster parents filed a motion to stay enforcement of the transfer order. The foster parents alleged that at the time of the hearing on the motion to transfer, they did not understand their rights as parties to the proceedings to "present evidence, cross-examine witnesses, testify on behalf of the minors, or have counsel separate and apart from

the GAL." The foster parents also asserted that there was "nothing in the record before this court [to establish] that [Cal. E. and Cas. E.] were ever part of an 'Indian family' as recognized by ICWA, other than that their mother was a tribal member," and cited Justice Heiple's concurring opinion in *S.S.*, 167 Ill. 2d at 265 (Heiple, J., concurring, joined by Bilandic, C.J., and Miller, J.), in which Justice Heiple wrote that, "[w]here *** there is no existing Indian family and the children have never been part of an Indian cultural setting or lived on a reservation, there is no justification for applying the ICWA."

¶ 80 The foster parents further asserted that "the laudable policy goals of ICWA ought not to be asserted to exercise dominion over a 7- and 9-year-old child who [do not] know, and have never known, anything regarding Togiak customs or culture" or "the people who ostensibly intend to raise the minors." The foster parents continued, "It cannot be reasonably said that the instant case furthers Congress' policy goals or legislative intent, which is to prevent the breakup of Indian families."

¶ 81 The foster parents also alleged that Cas. E. had been diagnosed with several behavioral health concerns that were not fully explored at the hearing, and which would have been relevant to whether there was good cause to deny the transfer, "at least on the ground that Cas. E. ought to continue to receive medical *** treatment on an uninterrupted basis."

¶ 82 Finally, the foster parents asserted that a 2016 neglect case involving the same parents and minors ended with custody being restored to Anthony, and not Demerle, which further supported their argument that there was no "Indian family" to protect within the meaning of ICWA. The foster parents asked the trial court to stay the order for transfer of jurisdiction and allow them the opportunity to present evidence consistent with the allegations in the motions.

¶ 83 The following day, on October 14, 2022, the foster parents filed a motion to

reconsider the transfer order. This motion asserted that because the foster parents were not "formally arraigned as to their rights as parties at the moment they understood the minors would be moved from their foster placement (at some time before the commencement of the hearing), they had no notice of their ability to, *inter alia*, call witnesses and present evidence and testimony at the hearing." The foster parents (1) asserted that these facts warranted reconsideration of the transfer order and (2) requested that the order be vacated and a new hearing be held, at which the foster parents could participate substantively. The foster parents incorporated by reference the allegations and arguments contained within their motion to stay enforcement of the transfer order.

¶ 84          The Tribe filed a response, arguing that the motion to stay should be denied because (1) the foster parents were not parties; (2) even if they were parties, the Tribe had already accepted jurisdiction before they filed their motions to stay and reconsider; and (3) the existing Indian family exception is not applicable. The Tribe attached to their response an "Order Accepting Transfer of Jurisdiction" entered by the Togiak Tribal Court on October 12, 2022. The order stated the following:

> "Based on the information provided by the State of Illinois, the continuation of the child(ren) in the home of the parent/guardian/custodian is contrary to the child(ren)'s welfare and removal from the home is in the best interest of the child. There is probable cause to believe that the conditions of the home are likely to continue until efforts can be made to improve or correct them.
>
> IT IS HEREBY ORDERED that the Togiak Tribal Court *** hereby accepts jurisdiction of these proceedings under 25 U.S.C. § 1911(b).
>
> IT IS FURTHER ORDERED that the child(ren) shall be placed with Emma and Roger Wassillie."

¶ 85    The foster parents filed a written reply asserting that they have been parties "since October 12, 2022 (at the very latest, but likely as of August 12, 2022 or earlier)." The foster parents also asserted that the Tribe's October 12, 2022, filing of the order transferring jurisdiction, which transferred custody of the minors to the Wassillies, "established the Party Foster Parents as parties to this case" because "the necessary and sufficient preconditions to confer party status upon the [foster parents] pursuant to 705 ILCS 405/1-5(2)(c) are, and were, objectively present as soon as the [Tribe's] October 12, 2022 order entered."

¶ 86    Additionally, the foster parents contended they filed their motion to stay within the 30-day period to for a party to file a motion to reconsider a final judgment (in this case, the September 15, 2022, transfer order). They further argued that the Code of Civil Procedure confers the right to seek a stay of a judgment "precisely to give parties an opportunity to determine their legal rights and recourse." They also argued that good cause existed for the trial court to reconsider its transfer order because (1) the minors desired to remain with the foster parents, (2) Cas. E.'s medical needs required care beyond what the Tribe could provide, and (3) the Wassillies were an unsuitable placement because they had never even spoken with the minors. The foster parents asked the court to vacate its transfer order.

¶ 87    In November 2022, the trial court entered a written order, finding that the foster parents did not have standing to present a motion to reconsider the transfer order because they did not have party status "before or at the time of that Judgment, and do not currently." The court wrote that it was "mak[ing] no ruling of any kind as to their standing to effectuate an Appeal of said Judgment."

¶ 88    The trial court further ordered, "As a conditional ruling, [the foster parents'] Motion to Reconsider the [transfer order] entered herein is denied in its entirety." However, "[b]ecause the

State and the [GAL] joined in and adopted [the foster parents' motion to stay the transfer order] *** the Judgment transferring jurisdiction in this cause *** entered on September 15, 2022, is stayed until finalization of the pending Appeal."

¶ 89     This appeal followed.

¶ 90                                   II. ANALYSIS

¶ 91     The foster parents appeal, arguing that the trial court erred by (1) finding that the foster parents were not parties, (2) failing to admonish them of their right as parties to participate in the transfer hearing, and (3) failing to apply the existing Indian family exception to ICWA.

¶ 92     The State, although technically an appellee, agrees generally with the foster parents and argues that (1) the trial court erred when it found that the foster parents were not parties and (2) the court should have denied the motion to transfer jurisdiction because (a) the minors were not "Indian children" subject to ICWA, (b) the minors' biological parents formally objected to tribal jurisdiction, and (c) good cause existed to deny the transfer.

¶ 93     The Tribe responds that (1) Illinois courts no longer have jurisdiction over these matters, (2) the trial court correctly found that the foster parents were not parties, (3) the foster parents do not have standing to appeal the transfer order, and (4) the court correctly found that good cause to deny the transfer did not exist.

¶ 94     We conclude that the trial court erred when it found that (1) the foster parents lacked standing to intervene, (2) the parents' written objections to transfer were (a) rendered a nullity by their deaths and (b) filed prematurely, and (3) good cause to deny transfer did not exist. Accordingly, we reverse and remand for further proceedings.

¶ 95                        A. Accelerated Appeal Filing Deadline

¶ 96     We note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a)

(eff. July 1, 2018). Under that rule, this court is required to issue its decision in an accelerated case within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 97 Here, the foster parents filed notices of appeal from the September 15, 2022, transfer order on October 14, 2022. They also filed notices of appeal from the trial court's November 7, 2022, order denying their motions to stay and reconsider the transfer order on December 6, 2022. (The appeals have been consolidated.) Accordingly, this court's disposition was due to be filed by May 5, 2023, which has passed. However, we note that the foster parents filed three motions for extension of time to file their brief and requested oral argument, which was conducted on May 16, 2023.

¶ 98 Given the motions for extensions of time and the need to schedule and hold oral argument, we conclude there is "good cause" for issuing our disposition after the 150-day deadline.

¶ 99 B. Jurisdiction

¶ 100 As an initial matter, the Tribe argues that Illinois courts have no jurisdiction over the minors' cases because the trial court transferred jurisdiction to the tribal court on September 15, 2022. In support, the Tribe cites two cases from other states—Alaska (*J.P. v. State*, 506 P.3d 3-4, 6 (Alaska 2022)) and California (*In re M.M.*, 65 Cal. Rptr. 3d 273, 275 (Ct. App. 2007)).

¶ 101 In *J.P.*, the Alaska Supreme Court declined to address the merits of an appeal by the foster parents of a minor whose child welfare case was transferred from the Alaska Superior Court to the Sun'aq Tribe's tribal court. *J.P.*, 506 P.3d at 4. The Alaska Supreme Court found that the appeal was moot because "a ruling in this case that the superior court erred in transferring jurisdiction to the Sun'aq Tribe could not afford [the foster parents] any relief because we have no power to force the tribal court to vacate its placement order and return jurisdiction to the superior

- 23 -

court." *Id.* at 5. The court addressed whether the public interest exception to the mootness doctrine would apply and found that it would not, reasoning that, because judges and litigants are careful, in most cases, to fashion orders transferring jurisdiction in a manner that preserves appellate rights, the circumstances present in *J.P.* were unlikely to recur. *Id.* at 6.

¶ 102        In *M.M.*, the California Court of Appeal similarly determined that it lacked jurisdiction to hear an appeal of an order transferring jurisdiction to a tribal court. *M.M.*, 65 Cal. Rptr. 3d at 275. In reaching its conclusion, the *M.M.* court first searched for guidance in cases involving appellate review of transfer orders under ICWA and found only one case directly addressing whether a transfer order affects the jurisdiction of the transferring court, *Comanche Indian Tribe of Oklahoma v. Hovis*, 847 F. Supp. 871 (W.D. Okla. 1994). *M.M.*, 65 Cal. Rptr. 3d at 283. In *Hovis*, the state court transferred jurisdiction, and the tribal court accepted, in 1987. *Id.* Nearly four years later, in 1991, the mother asked the state court to vacate its transfer order. *Id.* Relying on Oklahoma state law governing transfers of venue, the federal district court concluded that, at the time the motion to vacate was filed in 1991, because the state court had transmitted the case file to the tribal court, the state court no longer had jurisdiction to reconsider and vacate its transfer order. *Id.* at 284.

¶ 103        Apparently unwilling to rely solely on *Hovis*, the *M.M.* court looked for additional guidance in cases involving removal from state court to federal court. *Id.* The court observed that " 'a removal petition deprives the state court of jurisdiction as soon as it is filed and served upon the state court.' " *Id.* (quoting *People v. Bhakta*, 37 Cal. Rptr. 3d 652, 655 (Ct. App. 2006)).

¶ 104        Accordingly, applying the reasoning of *Hovis* and general federal removal principles, the *M.M.* court concluded that "[t]he Humboldt County[, California, Superior Court] lost jurisdiction over [the minor's] dependency proceeding once the case was transferred to the

[tribal court] and the latter court accepted jurisdiction." *Id.*

¶ 105    However, after recognizing that its disposition deprived the minor from having his claims heard on the merits, the *M.M.* court went on to advise future litigants how to preserve their right to appeal transfer orders in state court. The court advised that the dismissal of the minor's appeal "might have been averted had Minor's counsel sought an immediate stay of the transfer order pending Minor's exhaustion of his appellate remedies." (Emphasis omitted.) *Id.* at 287.

¶ 106    *J.P.* and *M.M.* are factually distinguishable. In the present case, the foster parents, the State, and the GAL asked the trial court to stay its order transferring jurisdiction pending appeal, and the trial court granted that request. In *J.P.*, the Alaska Superior Court denied the foster parents' request for a stay pending appeal, and in *M.M.*, no such motion was made. Indeed, in the present case, the foster parents did precisely what the *M.M.* court advised—they sought an immediate stay. The Tribe asserts that taking four weeks to request the stay was too long, but under the circumstances of this case—particularly when weighed against the nearly four years that passed in *Hovis*—we conclude that the foster parents, who were attempting to assert their statutory rights, acted sufficiently promptly.

¶ 107    In short, the Tribe has failed to cite any binding authority that would divest this court of jurisdiction to hear this appeal. Similarly, the Tribe has failed to cite any persuasive authority that would convince us to deviate from established Illinois law, which generally holds that a trial court retains jurisdiction over a cause for 30 days after entry of a final judgment or order. *Brewer v. National R.R. Passenger Corp.*, 165 Ill. 2d 100, 105, 649 N.E.2d 1331, 1334 (1995); see also Ill. S. Ct. R. 303 (eff. July 1, 2017) (stating a notice of appeal must be filed within 30 days after entry of the final judgment appealed from). Here, the foster parents filed their motion to stay within 30 days of the September 15, 2022, transfer order, while the trial court retained

jurisdiction. Illinois law also permits appellate review of trial court orders of dismissal on *forum non conveniens* grounds that result in interstate transfer. See, *e.g.*, *Quaid v. Baxter Healthcare Corp.*, 392 Ill. App. 3d 757, 763, 910 N.E.2d 1236, 1241-42 (2009) (holding the appellate court had jurisdiction to hear an appeal from trial court order of dismissal on *forum non conveniens* grounds resulting in transfer to California from Illinois).

¶ 108 We also note that the Illinois Appellate Court has, on at least one occasion, reviewed a trial court's order transferring jurisdiction under ICWA, although it did not directly address the question of jurisdiction. See *In re Armell*, 194 Ill. App. 3d 31, 45, 550 N.E.2d 1060, 1069 (1990) (affirming the trial court's order transferring jurisdiction of juvenile proceedings to tribal court under ICWA).

¶ 109 C. The Foster Parents' Standing

¶ 110 1. *The Applicable Law*

¶ 111 Section 1-5 of the Juvenile Court Act (705 ILCS 405/1-5 (West 2020)) governs the rights of parties in juvenile court proceedings. Regarding foster parents, subsection (2)(a) provides the general rule that current and former foster parents, although not parties to the proceedings, have the right to (1) receive adequate notice of any hearing or proceeding and (2) be heard by the court. *Id.* § 1-5(2)(a).

¶ 112 Subsection (2)(c), however, goes further and confers party status in some circumstances upon foster parents who have cared for a minor for over one year in some circumstances. The statute provides as follows:

> "If a foster parent has had the minor who is the subject of the [abuse or neglect] proceeding *** in his or her home for more than one year *** and if the minor's placement is being terminated from that foster parent's home, *that foster parent*

- 26 -

*shall have standing and intervenor status* except in those circumstances where [DCFS] or anyone else authorized under Section 5 of the Abused and Neglected Child Reporting Act has removed the minor from the foster parent because of a reasonable belief that the circumstances or conditions of the minor are such that continuing in the residence or care of the foster parent will jeopardize the child's health or safety or presents an imminent risk of harm to the minor's life." (Emphasis added.) *Id.* § 1-5(2)(c).

¶ 113                                   2. *This Case*

¶ 114         The Tribe argues that the trial court correctly found that the foster parents did not have standing and intervenor status. The Tribe does not dispute that the foster parents had the minors in their home for more than one year, but it does dispute that the second requirement of section 1-5(2)(c)—namely, that the minors' placement was being terminated from the foster parents' home—existed. The Tribe alternatively argues that, even if both prongs were met, the foster parents "never filed a timely motion to intervene." We disagree.

¶ 115         We conclude that *In re R.J.*, 2022 IL App (1st) 211542, a recent decision of the First District Appellate Court, is instructive. There, the minor had been placed with the foster parents since birth when, more than two years later, the trial court, upon the respondent father's recommendation, entered an order placing custody and guardianship with the minor's paternal aunt. *Id.* ¶¶ 1-2. The foster parents moved to intervene pursuant to section 1-5(2)(c), and the trial court denied their motion, believing it had discretion in the matter. *Id.* ¶¶ 3-4.

¶ 116         On appeal, the father argued in *R.J.*, as the Tribe does here, that the second requirement of section 1-5(2)(c) was not met because the court's order, which changed only custody and guardianship, was not a "placement" order terminating the minor's placement with

the foster parents; instead, the father argued, section 1-5(2)(c) applied only to situations in which DCFS, in its role as guardian, was terminating a child's placement in the foster home. *Id.* ¶ 64.

¶ 117　　　　The appellate court disagreed, reasoning that DCFS " 'placed' the minor in the temporary custody of the foster parents under section 2-7(1) of the Juvenile Court Act." *Id.* ¶ 65. The court noted that "temporary custody" under that section means " 'the temporary *placement* of the minor out of the custody of his or her guardian or parent' and includes placement in [a] foster home designated by DCFS." (Emphasis in original.) *Id.* (quoting 705 ILCS 405/2-7(1) (West 2020)). The First District held that the trial court's order transferring custody from the foster parents to the aunt was a placement decision that terminated the minor's placement with the foster parents. *Id.* ¶ 66.

¶ 118　　　　Concluding that both requirements of section 1-5(2)(c) had been met, the appellate court reversed the judgment of the trial court, holding that "foster parents who have had a minor in their home for over a year have an absolute statutory right to intervene when that placement has been terminated." *Id.* ¶ 5. The court wrote unequivocally that

> "the term *'shall'* refers to an obligatory duty a governmental entity is required to perform
> ***. [Citation.] When the foster parents moved to intervene, only six days after the October
> 28 order *began the process of* terminating the minor's placement with them, the trial court
> was required to permit the foster parents' intervention under subsection 2(c)." (Emphases
> added.) *Id.* ¶ 70.

¶ 119　　　　We agree with the First District's analysis and, in the present case, similarly conclude that the trial court's September 15, 2022, order began the process of terminating the minors' placement with the foster parents. That order vested the foster parents with standing and the right to intervene.

¶ 120       We further conclude that the foster parents, by filing their "Notice of Party Status," sufficiently invoked their right to intervene. The Tribe argues that the foster parents were required to file a "motion to intervene" but offers as authority for this proposition only section 2-408(a) of the Code of Civil Procedure (735 ILCS 5/2-408(a) (West 2020)), which provides that, "[u]pon timely application[,] anyone shall be permitted as of right to intervene in an action *** when a statute confers an unconditional right to intervene." Section 2-408(e) requires that "[a] person desiring to intervene shall present a petition setting forth the grounds for intervention, accompanied by the initial pleading or motion which he or she proposes to file." *Id.* § 2-408(e).

¶ 121       We conclude that the foster parents met the requirements of section 2-408 of the Code of Civil Procedure. Although they titled their filing as a "Notice of Party Status" instead of a motion or petition to intervene, "the character of the pleading should be determined from its content, not its label." *In re Haley D.*, 2011 IL 110886, ¶ 67, 959 N.E.2d 1108. The foster parents' "Notice of Party Status" met the substantive requirements of section 2-408 because it (1) set forth the grounds for intervention—namely, that the requirements of section 1-5(2)(c) of the Juvenile Court Act had been satisfied—and (2) was accompanied by the motion they proposed to file— namely, their motion to stay the transfer order and motion to reconsider.

¶ 122       We further conclude that the foster parents' filing of their notice of party status and motion to stay were timely because they were filed within 30 days of the trial court's order transferring jurisdiction. See 735 ILCS 5/2-1203(a) (West 2020) ("In all cases tried without a jury, any party may, within 30 days after the entry of the judgment *** file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief.").

¶ 123       Accordingly, we conclude that the trial court erred when it determined that the foster parents did not have standing to intervene.

¶ 124     Federal regulations promulgated by the BIA regarding ICWA require that "[a]ny party to the child-custody proceeding must have the opportunity to provide the court with views regarding whether good cause to deny transfer exists." 25 C.F.R. § 23.118(b) (2022). Because the foster parents had standing to intervene in the child custody proceedings and they were denied that right, along with the right to provide the court with their views regarding good cause, they have standing to appeal and we will consider the merits of their appeal.

¶ 125                                D. ICWA

¶ 126                          1. *The Applicable Law*

¶ 127     Congress enacted ICWA in 1978 to address the problem of "Indian children *** being separated from their families and their tribes and *** being placed in non-Indian homes through State foster care placement and adoption proceedings." *S.S.*, 167 Ill. 2d at 255-56; see also 25 U.S.C. § 1902 (2018) (declaring that the public policy of ICWA is "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.").

¶ 128     "At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings." *S.S.*, 167 Ill. 2d at 257. "[C]hild custody proceeding[s]" include any "foster care placement," "termination of parental rights," "preadoptive placement," or "adoptive placement." 25 U.S.C. § 1903(1) (2018). A "foster care placement" is "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." *Id.*

§ 1903(1)(i). An "adoptive placement" is "the permanent placement of an Indian child for adoption." *Id.* § 1903(1)(iv).

¶ 129    An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4). An "Indian child's tribe" is "(a) the Indian tribe in which an Indian child is a member or eligible for membership or (b) in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has more significant contacts." *Id.* § 1903(5).

¶ 130    Section 1911 of ICWA governs "Indian tribe jurisdiction over Indian child custody proceedings." *Id.* § 1911. Section 1911(b) applies when the Indian child does not live on the reservation of his tribe and provides as follows:

> "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[.]" *Id.* § 1911(b).

The Illinois Supreme Court has stated, "Under section 1911(b), there is *** a presumption that the tribal court should hear the case, but transfer to the tribal court is not required where there is [an] objection by either parent or where the trial court finds good cause to deny such a transfer." *S.S.*, 167 Ill. 2d at 263; see also 25 C.F.R. § 23.117 (2022) ("Upon receipt of a transfer petition *** the State court must transfer the child-custody proceeding unless *** (a) [e]ither parent objects to such transfer; (b) [t]he Tribal court declines the transfer; or (c) [g]ood cause exists for denying the

transfer.").

¶ 131    Neither ICWA nor the federal regulations promulgated thereunder by the BIA define what constitutes "good cause" to deny a transfer. The BIA regulations, however, provide factors that state courts may *not* consider when making a good cause determination:

"(1) Whether the foster-care or termination-of-parental-rights proceeding is at an advanced stage if the Indian child's parent, Indian custodian, or Tribe did not receive notice of the child-custody proceeding until an advanced stage;

(2) Whether there have been prior proceedings involving the child for which no petition to transfer was filed;

(3) Whether transfer could affect the placement of the child;

(4) The Indian child's cultural connections with the Tribe or its reservation; or

(5) Socioeconomic conditions or any negative perception of Tribal or BIA social services or judicial systems." 25 C.F.R. § 23.118(c) (2022).

¶ 132    In 2016, the BIA published on its website nonbinding guidelines to assist state courts in determining whether "good cause" to deny transfer exists. See U.S. Dep't of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf [https://perma.cc/Q6JV-YUR6]. Although the guidelines are nonbinding, they "must be accorded great weight in construing the ICWA." *Armell*, 194 Ill. App. 3d at 38 (citing *Batterton v. Francis*, 432 U.S. 416, 424 (1977)).

¶ 133    Regarding "good cause," the BIA guidelines state that "the statute [(ICWA)] and the rule [(25 C.F.R. § 23.118 (2016))] provide State courts with the discretion to determine 'good

cause' based on the specific facts of a particular case." U.S. Dep't of Interior, *supra*, at 49. The guidelines further state that "[t]he regulation's limitations on what may be considered in the 'good cause' determination do not limit State judges from considering some exceptional circumstance as the basis of good cause." *Id.* Last, the guidelines provide that "the 'good cause' determination whether to deny transfer to Tribal court should address which court is best positioned to adjudicate the child-custody proceeding, not predictions about the outcome of that proceeding." *Id.*

¶ 134   Questions of law are reviewed *de novo*. *In re C.N.*, 196 Ill. 2d 181, 203, 752 N.E.2d 1030, 1043 (2001). Whether the trial court properly applied ICWA to the facts of a case is reviewed *de novo*. *In re M.H.*, 2011 IL App (1st) 110196, ¶ 64, 956 N.E.2d 510 (citing *In re Cari B.*, 327 Ill. App. 3d 743, 749, 763 N.E.2d 917, 922 (2002) (where the "relevant facts are undisputed, and the resolution of [the issues on appeal] depends primarily on [the appellate court's] interpretation of the ICWA," whether the trial court properly applied ICWA to the facts of the case is a question of law that is reviewed *de novo*)).

¶ 135          2. *This Case*

¶ 136   The foster parents and the State both argue that the trial court's order transferring jurisdiction should be reversed. The foster parents contend that the court erred by failing to apply the "existing Indian family exception" to ICWA. The State asserts that (1) the children were not "Indian children" subject to ICWA, (2) both parents objected to tribal jurisdiction, and (3) good cause to deny transfer existed because (a) the minors lacked any connection to the Tribe, (b) holding the proceedings in Alaska would be more burdensome than holding them in Illinois, and (c) the proceedings were at an advanced stage by the time the Tribe sought transfer.

¶ 137   The Tribe responds that (1) this court should decline to apply the "existing Indian family exception" and (2) good cause to deny the transfer does not exist.

¶ 138    We agree with the State that the trial court erred by transferring jurisdiction because (1) the parents objected to tribal jurisdiction and (2) good cause existed to deny transfer.

¶ 139    a. The Parental Objections

¶ 140    The State argues that the trial court should have denied transfer because the minors' parents formally objected to tribal jurisdiction. The Tribe responds that the court correctly concluded that the parents' objections to transfer did not extend beyond their deaths. The Tribe contends that "[o]nce both parents had passed away, they do not continue to have ongoing rights to choose a forum. *** There is no reason why an objection to transfer would survive them, as there are no rights this objection protects." Notably, the Tribe cites no authority supporting its position (nor did the trial court).

¶ 141    The plain language of ICWA and the BIA's implementing regulations grant parents the express right to veto a transfer of jurisdiction. ICWA requires that a state court, "in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent." 25 U.S.C. § 1911(b) (2018). The BIA regulations are similarly clear, stating as follows:

> "[T]he State court must transfer the child-custody proceeding unless the court determines that the transfer is not appropriate because one or more of the following criteria are met:
>
> (a) Either parent objects to such transfer;
>
> (b) The Tribal court declines the transfer; or
>
> (c) Good cause exists for denying the transfer." 25 C.F.R. § 23.117 (2022).

¶ 142    The BIA guidelines further explain the parental objection provision as follows:

> "[Rule 23.117] reflects ICWA section 1911(b)'s requirement that a child-custody

proceeding be transferred to Tribal court upon petition of either parent or *** the Indian child's Tribe, except in three circumstances: (1) where either parent objects; (2) where the Tribal court declines the transfer; or (3) where there is good cause for denying the transfer.

***

The rule mirrors the statute in respecting a parent's objection to transfer of the proceeding to Tribal court. As Congress noted, '[e]ither parent is given the right to veto such transfer.' [H.R. Rep. No. 95-1386, at 21 (1978).] However, if a parent's parental rights have been terminated and this determination is final, they would no longer be considered a 'parent' with a right under these rules to object.

While[ ] this criterion addresses the objection of either parent, nothing prohibits the State court from considering the objection of the guardian *ad litem* or child himself under the third criteria (good cause to deny transfer), where appropriate." U.S. Dep't of Interior, *supra*, at 48.

¶ 143        The statute, regulation, and guidelines make eminently clear that a trial court must deny transfer if either parent has objected to the transfer. In the present case, both parents executed written objections to transferring jurisdiction to specifically the Togiak Tribal Court, and not to tribal jurisdiction generally. The trial court allowed some evidence at the hearing that Demerle subsequently reached out to Wassillie asking for some form of assistance because Demerle did not want the foster parents to adopt the children, but the court properly rejected that evidence as a hearsay statement to an interested party that "in no way supported a finding that the Mother actually revoked her written, signed, and court-filed objection." Even if we were to conclude that evidence was admissible and amounted to a rescission of her prior objection (which we, like the

trial court, do not), Anthony's objection would still be on record. And, as the BIA makes clear, *either* parent may veto a transfer of jurisdiction.

¶ 144        We agree with the State that the trial court erred by concluding that Anthony's death rendered his objection a "nullity." Neither the court nor the Tribe (who urges us to affirm the court on this point) offers any authority to support the conclusion that death renders a parental objection void. "Where the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express." (Internal quotation marks omitted.) *Lintzeris v. City of Chicago*, 2023 IL 127547, ¶ 26. We conclude that the court erred by reading into ICWA a limitation that the statute does not contain. To be clear, our holding is limited to the circumstances in this case, where both parents made specific objections and died shortly thereafter.

¶ 145        Although the BIA guidelines address the effect of a trial court's termination of the parental rights of a parent who states his or her objection to transfer of jurisdiction to a tribe—pointing out that the objection of such a parent is of no effect—those guidelines say nothing of a parent's death, likely because the effect of a termination of a parent's rights is far different than the effect of a parent's death. Termination occurs only after a trial court has found (1) a parent unfit and (2) the child's best interests would be served without the parent in the child's life. Accordingly, any decisions, plans, or hopes of that parent for that child are rendered meaningless. The objection of an unfit parent to transfer is likewise of no effect.

¶ 146        On the other hand, it would be absurd to say that a deceased parent's wishes for his or her child should be ignored solely because of that parent's death. The deceased parent's concerns for the best interests of that child survive the parent's death, especially, as here, when that parent has expressed his or her views or concerns in writing, usually in a will.

¶ 147   We also reject the Tribe's argument that the objections had no effect because they were executed prematurely, before the petition for transfer was filed. This argument echoes the trial court's finding that "the Statute requires that a Petition to Transfer needs to be filed and pending *** before the parents can object to the requested transfer." By reaching this conclusion, the court has again read a condition into the statute that Congress did not put there. Moreover, neither the court nor the Tribe offer any authority for the existence of such a requirement. ICWA contains no language that prohibits a parent from recording his or her objection to a transfer prior to a formal petition for transfer being filed.

¶ 148   Nor does the structure of the statute support the trial court's finding. The court found that inclusion of the words "upon the petition of" in section 1911(b) meant that the petition must be filed before a parent may object. We disagree. The section reads as follows:

> "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[.]" 25 U.S.C. § 1911(b) (2018).

The structure of the statute, in particular the placement of the phrase "absent objection by either parent" *before* the words "upon the petition of" suggests that the statute does *not* contemplate a petition being filed before an objection may be raised.

¶ 149   On this record, it is not surprising that the parents here would have anticipatorily executed their objections to the Tribe's participation. After all, Anthony and Demerle had been involved in a 2016 neglect case in which the Tribe also sought to intervene, and one could easily

foresee that the Tribe would seek to intervene again. The fact that Anthony and Demerle executed their written objections at the very beginning of the 2020 case, before the Tribe even had the chance to request a transfer, further supports giving their parental objections great weight. A reasonable inference from the fact that one of the first actions Anthony and Demerle took in this case was to object to transfer *to Togiak and only Togiak* is that they wished to execute their parental veto at the earliest opportunity to prevent the Tribe from ever seeking transfer.

¶ 150         We emphatically reject the Tribe's arguments that (1) a parent can object to transfer only *after* a petition to transfer is filed and (2) a parent's death renders his or her objection nugatory. First, as we have pointed out, the Tribe offers no authority for these positions. Second, to accept the Tribe's argument would lead to absurd results in juvenile cases, which can often take many years to resolve. Under the Tribe's reading of ICWA, which would prohibit an anticipatory parental objection and render it void upon death, a five-year-long juvenile court case could be effectively undone if an objecting parent died.

¶ 151         And what about an objecting parent who is diagnosed with a terminal disease? The Tribe's position is that the objection of that parent to transfer would become nugatory when he or she died, no matter how concerned that parent may be about which court would be deciding his or her children's future after the parent's death.

¶ 152         It is firmly rooted in Illinois and federal law that "[o]ne of the fundamental rights protected under the fourteenth amendment is the right of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion." *Wickham v. Byrne*, 199 Ill. 2d 309, 316, 769 N.E.2d 1, 5 (2002). The Tribe's argument in this case twists this foundational legal principle from one that recognizes and protects a fundamental human right to one that restricts and curtails it. Under the Tribe's reasoning, a person's fundamental right to make

decisions regarding his or her children, rather than simply being protected by the fourteenth amendment, becomes limited to that person's lifetime is and is terminated upon his or her death. The Tribe's argument is antithetical to centuries of societal customs, norms, and attitudes, which give great weight and significance to a parent's wishes and decisions regarding the care, custody, and upbringing of his or her child, even after an untimely death.

¶ 153 For the foregoing reasons, we conclude that the trial court erred when it found that the parental objections to transfer were premature and rendered a nullity by the parents' deaths. Moreover, as we discuss (*infra* ¶¶ 179-83), even if the parental objections lacked veto effect, the GAL's objection, in conjunction with the parents' objections, constituted good cause to deny transfer.

¶ 154                              b. Good Cause To Deny Transfer

¶ 155 The State contends that good cause to deny transfer existed because (1) the minors lacked any connection to the Tribe, (2) conducting the proceedings in Alaska would be more burdensome than conducting them in Illinois, and (3) the proceedings were at an advanced stage when the Tribe sought transfer.

¶ 156 As noted (*supra* ¶ 134), our review is *de novo* because (1) the relevant facts are not disputed and (2) the appeal depends primarily on our interpretation of ICWA and whether the trial court properly applied the statute to the facts of the case. See *M.H.*, 2011 IL App (1st) 110196, ¶ 64.

¶ 157                              i. *The Minors' Connection to the Tribe*

¶ 158 The State argues that the minors in this case lacked any personal connection to the Togiak Tribe. The State correctly observes that the only connection the minors have to the Togiak Tribe is that their mother (1) was a member of a related, neighboring tribe and (2) was eligible for

membership in the Togiak Tribe. Not only had the minors never lived on a reservation or in an Indian cultural setting, they were not even aware of their mother's, and therefore their own, native ancestry until the spring of 2022, when McChesney discussed it with them. At that time, Cal. E. was nine years old, and Cas. E. was seven years old. McChesney testified that both minors had very limited knowledge of Native American culture in general and had no knowledge of their own native ancestry or family. The children were happy to hear that they had relatives on their mother's side of the family and stated that they did not have pictures of their mother.

¶ 159    McChesney opined that transfer would be appropriate because the children expressed a desire to know about their heritage. Their great aunt, Wassillie, testified that she had never spoken with the children. She testified that her brothers and sisters had spoken with them over the telephone, but she did not state who, when, how many times, or for how long. Moreover, the children's mother was not a member of the Togiak Tribe, but instead a member of the Kwinhagak Tribe. (We note that the Tribe in its filings before the trial court asserted that Demerle was eligible for membership in the Tribe.) The Togiak Tribe unilaterally enrolled the children as members of the Tribe in March 2021, without input from the children, their parents (who were deceased at that time), or the GAL.

¶ 160    Nonetheless, the BIA has issued binding regulations that prohibit a state court from considering "[t]he Indian child's cultural connections with the Tribe or its reservation" when determining whether good cause exists to deny transfer of jurisdiction to tribal court. 25 C.F.R. § 23.118(c)(4) (2022); see also *Brackeen v. Haaland*, 994 F.3d 249, 352-58 (5th Cir. 2021) (holding that the BIA possessed authority under ICWA to issue binding regulations).

¶ 161    In support of its argument that the trial court erred by failing to consider the minors' lack of contacts with the Tribe, the State relies on outdated, nonbinding BIA guidelines from 1979,

which stated that good cause to deny transfer may exist if, among other things, "[t]he parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,591 (Nov. 26, 1979). As the Tribe correctly points out, the BIA has withdrawn the 1979 guidelines, replacing them with binding regulations and new guidelines in 2016, and state courts can no longer consider a minor's lack of cultural connection to the tribe seeking transfer.

¶ 162     Accordingly, the minors' lack of connection to the Tribe does not constitute good cause to deny transfer.

¶ 163     ii. *The Advanced Stage of the Proceedings When the Tribe Intervened*

¶ 164     The State also argues that good cause to deny transfer existed because the proceedings were at an advanced stage by the time the Tribe intervened.

¶ 165     The Tribe responds that it is irrelevant that it did not intervene and seek to transfer the case until the proceedings were at an advanced stage because it (1) did not receive notice of the proceedings in a timely manner and (2) filed the transfer motion within three months of being permitted to intervene. In support of its argument, the Tribe points to the 2016 regulations, which prohibit state courts from considering "[w]hether the *** proceeding is at an advanced stage if the *** Tribe did not receive notice of the child-custody proceeding until an advanced stage." 25 C.F.R. § 23.118(c)(1) (2016). (We note that the State did not address this regulation in its brief.)

¶ 166     We agree with the Tribe. Although the Tribe received notice of the hearings in December 2020 and did not file its motion for transfer until November 2021, the State was responsible for an eight-month delay in sending the Tribe notice in the first place. Although it could fairly be said that the proceedings were at an advanced stage by the time the Tribe sought

transfer, because the State sent late notice to the Tribe, the applicable regulation prohibits us from holding this factor against the Tribe.

¶ 167                    iii. *The Burden of Conducting Proceedings in Alaska Versus in Illinois*

¶ 168          The State also argues that the trial court erred by finding that conducting proceedings in Alaska would be no more burdensome than conducting them in Illinois. The State contends that "[e]veryone involved in this case, except the Togiak [T]ribe *** [is] located in Illinois," including "the foster parents and foster home [that the minor children] have known for as long as they can remember."

¶ 169          The BIA guidelines state that "[t]he legislative history [of ICWA] indicates that this [good cause] provision is intended to permit a State court to apply a modified doctrine of *forum non conveniens*, in appropriate cases, to insure that the rights of the child as an Indian, the Indian parents or custodian, and the Tribe are fully protected." U.S. Dep't of Interior, *supra*, at 48-49.

¶ 170          The *forum non conveniens* doctrine "allows a court to decline jurisdiction *** if it appears that another forum can better serve the convenience of the parties and the ends of justice." *Fennell v. Illinois Central R.R. Co.*, 2012 IL 113812, ¶ 12, 987 N.E.2d 355. Illinois courts conducting a *forum non conveniens* analysis evaluate private interest factors and public interest factors to determine whether the balance of factors favors another forum. *Id.* ¶ 17. Public interest factors typically include considerations such as (1) the administrative burden of litigating in a congested venue, (2) the unfairness of imposing jury duty on residents of a community with no connection to the litigation, and (3) the interest in having local controversies decided locally. *Id.* ¶ 16.

¶ 171          Typical private interest factors include "[(1)] the convenience of the parties;

[(2)] the relative ease of access to sources of testimonial, documentary, and real evidence; [(3)] the availability of compulsory process to secure attendance of unwilling witnesses; *** and [(4)] all other practical considerations that make a trial easy, expeditious, and inexpensive." *Id.* ¶ 15.

¶ 172      In *M.H.*, 2011 IL App (1st) 110196, ¶ 56, the First District Appellate Court addressed undue hardship to the parties when affirming the trial court's finding that good cause existed to deny transfer of jurisdiction from Illinois to a tribal court located in Wisconsin. The appellate court noted that the tribal court was located 400 miles from Chicago, where the minor resided, and concluded that "[t]raveling this distance for the proceeding would be unduly burdensome on [the minor] *** and the other potential witnesses involved in [the minor's] case, the majority of whom reside in Chicago." *Id.* The court also wrote the following:

> "Although [the mother and father (who were members of the Bad River Band of Lake Superior Tribe of Chippewa Indians)] reside on the reservation, they spent a majority of their life in Chicago and did not move to the reservation until after the Tribe filed its petition to transfer. Because the bulk of the evidence and the majority of the witnesses necessary to the proceeding are located in Illinois, a transfer would constitute an undue hardship." *Id.*

¶ 173      Similarly, in *S.S.*, 167 Ill. 2d at 264, the supreme court found that litigating the termination and adoption proceedings in Montana (the location of the tribal court) would be unduly burdensome on "the children, their custodians, the adoption petitioners, and all the other potential witnesses," who resided in Illinois, because (1) the distance from Chicago to Montana was over 1100 miles and (2) "the bulk of the evidence and the majority of the witnesses necessary to the termination of parental rights action are located in Illinois."

¶ 174      The present case is similar to *M.H.* and *S.S.* because (1) Cal. E. and Cas. E. live in

Illinois and have never lived in Alaska and (2) nearly all of the witnesses and evidence necessary to determining their best interests are located in Illinois. Moreover, nothing in the record suggests that Anthony ever lived in or near Togiak, Alaska, or tribal lands. And although the information about Demerle's history of residence is lacking, the record demonstrates that she (1) was not a member of the Togiak Tribe, (2) became a member of the Kwinhagak Tribe in 2016, and (3) was not living on an Indian reservation in the immediate period prior to the filing of the petition for adjudication of wardship or after its filing in 2020. Moreover, the distance from Illinois to Alaska is significantly greater than Wisconsin or Montana. And, once one travels to Alaska, Togiak is accessible only by air.

¶ 175            On the other hand, *M.H.* was decided in 2011, before the technology to conduct remote proceedings was as available as it is today. The trial court correctly noted that videoconferencing technologies such as Zoom have made it much easier to conduct meetings or proceedings anywhere in the country. Indeed, during the COVID-19 pandemic, courts routinely conducted proceedings via Zoom, and they have continued to do so in the years since. The Illinois Supreme Court recently adopted Illinois Supreme Court Rule 45 (eff. Jan. 1, 2023), which facilitates remote participation in juvenile neglect proceedings.

¶ 176            Nonetheless, the trial court in this case considered *only* the availability of Zoom technology to conclude that litigating in Alaska versus Illinois presented no undue hardship. In doing so, the court reasoned that "multiple parties" attended the June 2022 hearing remotely. We can discern from the transcript that Wassillie and her supervisor attended remotely, as did the "official keeper of records and official reporter" for Carroll County. We note that (1) the transcript of the hearing contains nine notations by the reporter of "technical difficulties" and six notations of "unintelligible" and (2) the court itself stated, "[O]ne problem with Zoom is I can never tell

when somebody's done talking," and "Zoom *** isn't great with external audio."

¶ 177    More importantly, however, the trial court considered only the "geographical distance" between Illinois and Alaska. In doing so, the court failed to consider that, with the addition of the foster parents as parties, *five* parties reside in Illinois (Cal. E., Cas. E., the State, DCFS, and the foster parents) and just one party resides in Alaska (the Tribe). Furthermore, this case centers on the lives of two minors—now ages 10 and 8—who have spent their entire lives in Illinois. The witnesses located in Alaska, who have never seen the children in person, comprise a very small part of the evidence in this case. When Wassillie was asked whether she would travel to Illinois to make a best interest determination for the children, she stated that she had never traveled (except to pick up a child at the airport) and that she and her coworkers usually "did everything over the phone."

¶ 178    By considering only that the geographical distance between Illinois and Alaska was neutralized by the ability of the case participants in Illinois to attend by Zoom, the trial court did not conduct a proper analysis of the *forum non conveniens* factors. Properly considered, the private interest factors weigh heavily in favor of Illinois as the preferred forum.

¶ 179                         iv. *The Objection of the GAL*

¶ 180    Although not raised in the State's brief, we note that, in its written closing argument before the trial court, the State additionally argued that good cause to deny transfer existed, in part, because the GAL objected to transfer on behalf of the children. The State cited the "Guidelines for Implementing the Indian Child Welfare Act," published by the Department of the Interior in December 2016 in support of its argument. The BIA guidelines state, "While[ ] this criterion [(25 C.F.R. § 23.117(a) (2016))] addresses the objection of either parent, nothing prohibits the State court from considering the objection of the *guardian ad litem* or the child himself under the third

criteria (good cause to deny transfer), where appropriate." U.S. Dep't of Interior, *supra*, at 48.

¶ 181        We can hardly imagine a more appropriate case in which the trial court should have given the GAL's objection significant, if not determinative, weight. Both parents executed written objections to tribal jurisdiction at the initiation of the case. Within months thereafter, both parents died. Despite the parental objections, the Tribe sought a transfer. The GAL—at this point, the sole representative of the children—objected to transfer.

¶ 182        Although the State urged the trial court to consider the GAL's objection and pointed the court to the authority permitting the court to do so, the court did not address in its order what weight, if any, it gave to the fact that the GAL was objecting. The court may have considered the GAL's arguments against transfer, but the record does not suggest that the court viewed the mere fact of the GAL's objection as a good cause factor, despite the BIA's guidelines specifically identifying the GAL's objection as such.

¶ 183        We conclude that the GAL's objection to transfer should have been afforded weight in the trial court's good cause analysis *in this case* because (1) the GAL was the voice of the minors and (2) the GAL's objection was consistent with the parents' written objections. Even if the parents' written objections alone did not operate to veto the transfer, the court at a minimum should have given their objections significant weight in its good cause analysis.

¶ 184                               v. *Cumulative Effect*

¶ 185        We conclude that the trial court did not properly apply ICWA to the facts of this case when it found that good cause to deny transfer did not exist. As we noted (*supra* ¶ 131), the BIA regulations do not define "good cause" and identify only factors that a court *cannot* consider when determining if good cause exists to deny transfer. The BIA guidelines expressly state that "good cause" should be determined "based on the specific facts of a particular case" and the court

may consider "exceptional circumstance[s]" as the basis of good cause. U.S. Dep't of Interior, *supra*, at 49.

¶ 186    In the present case, the trial court failed to consider the unique facts of this case when determining that good cause to deny transfer did not exist. To the contrary, the court considered almost exclusively the strictures placed upon it by ICWA. In doing so, the court failed to identify those facts present that it *could* consider, namely, (1) nearly all of the witnesses and evidence necessary to determine the best interests of Cal. E. and Cas. E. are located in Illinois, (2) five of the six parties to the litigation are located in Illinois, (3) the biological parents of Cal. E. and Cas. E. executed written objections specifically to Togiak tribal jurisdiction, and (4) the GAL also objected to Togiak tribal jurisdiction.

¶ 187    We also note that the trial court erred by denying the foster parents' motions to intervene and reconsider the transfer order. The foster parents alleged in their motion that Cal. E. and Cas. E. wished to stay in Illinois. The wishes of the children, particularly at 10 and 8 years old, would have contributed to the court's good cause analysis and should have been allowed.

¶ 188    All of these factors cumulatively establish that (1) the trial court did not properly apply ICWA to the facts of this case and (2) good cause to deny transfer existed.

¶ 189    Accordingly, we reverse the trial court's judgments (1) finding that the foster parents did not have standing and (2) granting the Tribe's motion to transfer jurisdiction. Furthermore, we remand this case with directions for the trial court to (1) vacate its September 15, 2022, order transferring jurisdiction; (2) enter an order denying the Tribe's motion to transfer jurisdiction, consistent with this opinion; and (3) grant the foster parents' motion to intervene.

¶ 190    Because Illinois courts will retain jurisdiction and Illinois law will continue to apply, we remand for further proceedings under the Juvenile Court Act (705 ILCS 405/1-1 *et seq.*

(West 2020)).

¶ 191                                   III. CONCLUSION

¶ 192          For the reasons stated, we reverse the judgment of the trial court and remand for

further proceedings.

¶ 193          Reversed and remanded.

*In re Cal. E.*, 2023 IL App (4th) 220930

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Carroll County, Nos. 20-JA-3, 20-JA-4; the Hon. David Olson, Judge, presiding. |
| **Attorneys for Appellant:** | Brendan W. Caver, of Law Office of Brendan W. Caver, Ltd., of Rockford, for appellants. |
| **Attorneys for Appellee:** | Aaron Kaney, State's Attorney, of Mt. Carroll (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | Bradley R. Tengler, of Law Office of Bradley R. Tengler, P.C., of Rockford, Kathryn E. Fort, of Indian Law Clinic at Michigan State University College of Law, of East Lansing, Michigan, and Rebecca Patterson, of Sonosky, Chambers, Sachse, Miller & Monkman, LLP, of Anchorage Alaska, for intervenor-appellee. |